UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

*v.*

JOSHUA WANDER,

               *Defendant*.

**No. 25 Cr. 473 (JPO)**

**DEFENDANT JOSHUA WANDER'S MEMORANDUM OF LAW IN SUPPORT OF
<u>HIS MOTION FOR AN EVIDENTIARY HEARING</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

      A.    Mr. Wander Co-Founds 777 Partners LLC, Growing It into a Successful Business. ............................................................................................................. 3

      B.    *Semafor* Publishes an Article About the Prosecution's Investigation in November 2023. ................................................................................................... 4

      C.    *Semafor*'s Article Followed the High-Profile Trial of Sam Bankman-Fried. ......... 6

      D.    The Harmful News Stories About 777 Partners Continued. ................................ 7

      E.    These Stories Harmed Mr. Wander's Defense, His Businesses, and His Lenders. ............................................................................................................ 9

            1.    TAMI .................................................................................................. 10

            2.    Everton ............................................................................................... 11

            3.    Leadenhall ........................................................................................... 11

      F.    Mr. Wander Requests More Information About the Disclosure from the Prosecution. ..................................................................................................... 13

LEGAL STANDARD ....................................................................................................... 13

ARGUMENT .................................................................................................................. 17

      I.    Mr. Wander Has More Than Established a *Prima Facie* Showing of Violations of the Grand Jury Secrecy Rule. ...................................................... 17

      II.    Scope of an Evidentiary Hearing. .................................................................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barry v. United States,*
    865 F.2d 1317 (D.C. Cir. 1989) ............................................................................15, 16, 17

*Comm. on Judiciary, U.S. House of Representatives*, 332 F.R.D. 412 (D.D.C.
    2019) ........................................................................................................................15, 18

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.,*
    441 U.S. 211 (1979) ..........................................................................................................14

*In re Grand Jury Investigation,*
    610 F.2d 202 (5th Cir. 1980) ......................................................................................16, 22

*In re Grand Jury Matter,*
    697 F.2d 511 (3d Cir. 1982) .............................................................................................18

*In re Sealed Case No. 98-3077,*
    151 F.3d 1059 (D.C. Cir. 1998) ..................................................................................14, 17

*United States v. Adams,*
    755 F. Supp. 3d 519 (S.D.N.Y. 2024) ................................................................15, 16, 18, 24

*United States v. Coughlan,*
    842 F.2d 737 (4th Cir. 1988) ............................................................................................17

*United States v. Cuervelo,*
    949 F.2d 559 (2d Cir. 1991) .............................................................................................17

*United States v. Friedman,*
    854 F.2d 535 (2d Cir. 1988) .............................................................................................14

*United States v. Jacobs,*
    547 F.2d 772 (2d Cir. 1976) .......................................................................................17, 23

*United States v. Leeper,*
    2006 WL 1455485 (W.D.N.Y. May 22, 2006) ..................................................................17

*United States v. Nordlicht,*
    2018 WL 6106707 (E.D.N.Y. Nov. 21, 2018) ...................................................................16

*United States v. Rioux,*
    97 F.3d 648 (2d Cir. 1996) ................................................................................14, 15, 17, 24

*United States v. Skelos,*
    2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ..........................................................15, 16, 18

*United States v. Walters,*
    910 F.3d 11 (2d Cir. 2018) ........................................................................................ *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Statutes**

18 U.S.C. § 1956 .................................................................................................6, 20

**Other Authorities**

Robert H. Jackson, *The Federal Prosecutor* (1940) ........................................................13

U.S. Dep't of Just., Justice Manual § 1-7.400(B) ..........................................................14

**Rules**

Fed. R. Crim. P. 6(e)(2)(B) ..........................................................................14, 15

Fed. R. Crim. P. 6(e)(7) ..............................................................................14, 17

Loc. Crim. R. 23.1(a) ....................................................................................2, 13

**Regulations**

28 C.F.R. § 50.2(b)(2) ......................................................................................13

iii

**PRELIMINARY STATEMENT**

For more than a year, sensitive information about the prosecution's investigation of Joshua Wander and his company 777 Partners LLC was disclosed to the news media. Reporters around the world, attributing their information to "people familiar with the matter" and naming the specific prosecutor leading the investigation, published accounts of the scope of the prosecution's investigation, its legal theories, categories of witnesses the prosecution had interviewed, the issuance of grand jury subpoenas, and the targets of those subpoenas. Tellingly, the first story, reported by *Semafor*, disclosed that the prosecution was considering a joint investigation with law enforcement in Florida—information that could only have been known by someone inside the government, as no witness or subpoena recipient would have been privy to internal deliberations about interagency coordination.

The initial leak came to light while 777 Partners was awaiting Premier League approval of its bid to acquire Everton F.C. ("Everton"), a Liverpool-based soccer club that Mr. Wander viewed as substantially undervalued. Notably, the same unit at the U.S. Attorney's Office, the same prosecutor, and the same law enforcement agency (the Federal Bureau of Investigation) were, at the same time that leak occurred, handling the prosecution of the owner of the Premier League club Tottenham Hotspur F.C.—itself a matter of significant press coverage. The same unit, prosecutor, and agency had also recently concluded the trial of Sam Bankman-Fried. That trial generated extraordinary media attention, and the U.S. Attorney's Office had been actively engaging with the financial press. *Semafor,* the outlet that published the initial leak about Mr. Wander, published a story about that trial, just weeks before the article about the 777 Partners investigation appeared.

The consequences of these disclosures were severe. The initial leak was amplified across other news outlets, including the financial and soccer press, and social media. The leak derailed

1

the Everton transaction and set off a broader collapse: financing counterparties pulled back, stakeholders tightened oversight, and deals were delayed or rejected, with counterparties frequently pointing to the need for additional diligence following the news reports.  These were significant because at the same time, Mr. Wander was negotiating with some of his lenders toward a resolution of outstanding disputes, which meant that liquidity was critical.  Without the liquidity from these ordinary course transactions, 777 Partners was unable to make payments that came due to one of its largest lenders, making a negotiated resolution impossible and harming 777 Partners and its stakeholders.  Subsequent articles compounded the harm, precipitating further financial deterioration, litigation, and pressure on Mr. Wander to resign from the company.  The disclosures appear to have served the prosecution's interests as well: 777 Partners' former Chief Financial Officer began cooperating during the adverse press coverage.

Federal Rule of Criminal Procedure 6(e) bars the prosecution from disclosing grand jury information.  This Court's Local Criminal Rule 23.1 further bars the prosecution from disseminating non-public information about its investigation in a manner that would interfere with the defendant's right to a fair trial or prejudice the administration of justice.  Mr. Wander and his team have reviewed the discovery in detail and have found no indication that any party outside of the prosecution was the source of the stories.  On February 27, 2026, Mr. Wander wrote to the prosecution team requesting confirmation that it was not the source of the disclosures and that it had complied with its obligations under Rule 6(e).  The prosecution has not responded in the more than five weeks since that letter was sent.

Mr. Wander has a right to know whether the prosecution team leaked sensitive information that prejudiced him and his criminal case.  This Court should order the prosecutors, their supervisors at the time, and relevant law enforcement personnel to submit sworn affidavits

2

stating whether they were the source of the leaks.  The Court should then hold a hearing to examine the prosecution team's conduct and fashion an appropriate remedy.

## FACTUAL BACKGROUND

**A.      Mr. Wander Co-Founds 777 Partners LLC, Growing It into a Successful Business.**

Mr. Wander co-founded 777 Partners LLC (together with its affiliates and subsidiaries, "777 Partners") in 2015 as a private investment firm focused on alternative asset classes, including annuities tied to structured settlements.  Indictment ¶ 2.  Over the following years, 777 Partners and its related entity 600 Partners LLC ("600 Partners") grew into a multibillion-dollar enterprise with more than 50 portfolio companies and 1,000 employees spanning consumer and commercial finance, insurance, aviation, sports media and entertainment, litigation finance, and direct lending.  *Accord* Martinez Decl. Exs. 1 (SEC Complaint) ¶¶ 25–26; 2 (777 Partners' Investor Presentation) at 9, 14.

By 2021, macroeconomic headwinds, including COVID shutdowns, capital markets volatility, and rising interest rates, had created liquidity pressures across the enterprise.  *See, e.g.*, Indictment ¶ 7 (noting that rising interest rates and increased competition in structured settlements caused liquidity pressures in 2021).  The prosecution alleges that these pressures led Mr. Wander to misuse credit facilities and misrepresent 777 Partners' financial condition to its lenders and investors.  *Id.* ¶¶ 8–26.  Mr. Wander disputes those allegations and will contest them vigorously.  But what is clear is that the financial difficulties 777 Partners faced were substantially exacerbated by forces outside Mr. Wander's control—including rising interest rates, the collapse of the aviation sector during and after the pandemic, and the media firestorm ignited by the disclosure of the investigation, which derailed the transactions that Mr. Wander was actively pursuing to address the company's outstanding obligations.  *See id.* ¶ 7; Martinez Decl. Exs. 3 (April 29, 2020 *The Guardian* article); 4 (August 24, 2020 *Avionics International* article).

In the spring of 2023 and thereafter, Mr. Wander was in constant negotiations with 777 Partners' lenders about resolving issues related to the credit facilities.  Indictment ¶ 22.  Mr. Wander proposed using a mix of balance sheet assets from 777's vast portfolio, sales of select portfolio companies, and discrete investments in certain accretive new assets to satisfy the lenders.  *See id.* (referencing discussions between "Lender-1," who on information and belief is Leadenhall Capital Partners LLP ("Leadenhall"), and 777 Partners to address the credit facility overdraw through new assets and deal proceeds).  For example, Mr. Wander had entered into an agreement to acquire the majority ownership of Everton and was anticipating the Premier League's approval of his purchase by year-end.  *See* Martinez Decl. Ex. 5 (September 15, 2023 *Associated Press* article).  Additionally, in the fall of 2023, 600 Partners staff were negotiating to sell notes from a wholly-owned subsidiary, Trans Atlantic Lifetime Mortgages, Ltd. ("TAMI"), which would have netted 777 Partners tens of millions in short-term profits.  Martinez Decl. Ex. 6 (internal email projecting deal delivering $37 million in profits in December 2023 and another $30 million in January 2024).  But these deals—which could have resolved the outstanding issues with the lenders given the projected profits—were delayed, significantly reduced, or "never came to fruition" at all.  Indictment ¶ 22.

**B.    *Semafor* Publishes an Article About the Prosecution's Investigation in November 2023.**

These deals did not fall apart on their own.  They were scuttled in the midst of a media firestorm.  On November 29, 2023, a reporter from online news outlet *Semafor* contacted 777 Partners staff and stated that she "[w]anted to let you know about a story we're planning to run tomorrow saying that DOJ, Southern District of NY and Miami offices, have opened an investigation into 777, including whether it has violated anti money laundering laws.  If you'd like to comment, please let me know."  Martinez Decl. Ex. 7 (November 29, 2023 email from

*Semafor* reporter Liz Hoffman).  After some back-and-forth, the reporter stated that while the Department of Justice had not announced any investigation, "unnamed sources" whom she had "properly vetted" told her there was a "formal" investigation at an "early stage."  *Id.*  Notably, using language characteristic of prosecutors rather than witnesses, the reporter added that "not all investigations lead to enforcement actions."  *Id.*

The next day, the reporter published her story, "Feds probe sports investor 777 over money flows."  Martinez Decl. Ex. 8 (November 30, 2023 *Semafor* Article).[1]  Basing her story on "people familiar with the matter," this article (the "November 2023 *Semafor* Article") enumerates details about the prosecution's investigation that could only have been known by an individual particularly close to the investigation:

- Which U.S. Attorney's Office was overseeing the investigation;

- The identity of one of the prosecutors in charge;

- That the investigation included "probing whether 777 violated U.S. money-laundering laws, among other infractions"; and

- That the prosecution was considering a joint investigation with law enforcement in Miami.

That last detail is particularly significant.  The consideration of a joint investigation is not the kind of information that would appear in a subpoena or be shared with a witness.  It reflects a conversation that could only have taken place *within* the government.

These highly sensitive details were not speculation.  A subpoena, dated February 8, 2024, was sent to 777 Partners from the person named as the lead prosecutor in the November 2023

---

[1]  It is apparent that *Semafor* has a relationship with the U.S. Attorney's Office.  For example, the prosecutor referenced in the initial article was recently a quoted source for the same *Semafor* reporter.  *See, e.g.,* Martinez Decl. Ex. 9 (February 26, 2026 *Semafor* article).

*Semafor* Article.  Martinez Decl. Ex. 10 (February 8, 2024 subpoena issued to 777 Partners). Later subpoenas confirmed that money laundering was one of the offenses under investigation, exactly as the article reported.  Martinez Decl. Ex. 11 (June 5, 2024 subpoena issued to 777 Partners citing 18 U.S.C. § 1956 as one of the violations under investigation).

The *Semafor* reporter tweeted the article with the prosecutor's picture and the following text: "Scoop: The Justice Dept is investigating 777's money flows.  The guy leading the probe prosecuted SBF, Giuliani associate Lev Parnas, Steve Bannon for the border-wall fraud, and pharma execs for opioid trafficking. Heavy hitter."  Martinez Decl. Ex. 12 (November 30, 2023 X post).  The photo of the prosecutor had "TURF BATTLE" layered on top—a reference to the inside information on an investigation with law enforcement in Miami.  *Id.*

*Semafor*'s article was retweeted and picked up by other outlets around the world.  Media outlets in the United Kingdom, where Everton plays, amplified reports about the investigation. *E.g.*, Martinez Decl. Exs. 13 (December 6, 2023 *The Sun* article titled "TOFFEES SHOCK: £550m Everton takeover could be OFF as US 'investigates buyers over money laundering allegations'"); 14 (December 1, 2023 *Daily Mail* article titled "DOJ launches probe into shadowy Miami-based sports investing giant 777 Partners amid accusations of money laundering and how it plans to afford $635 million bid for UK soccer team Everton").  The more traditional sports and financial press followed with articles, sometimes accompanied by further corroboration from "a person familiar with the inquiries."  Martinez Decl. Exs. 15 (December 6, 2023 *Bloomberg* article citing to the November 2023 *Semafor* Article, along with apparent additional confirmation of the investigation); 16 (December 7, 2023 *The Times* article mentioning the investigation).

**C.     *Semafor*'s Article Followed the High-Profile Trial of Sam Bankman-Fried.**

The November 2023 *Semafor* Article was not the outlet's first coverage of the U.S. Attorney's Office at SDNY.  In the weeks immediately preceding it, the same prosecutor named

6

in the article had been at the center of one of the most high-profile financial fraud trials in recent memory: the prosecution of Sam Bankman-Fried, the founder of the FTX cryptocurrency exchange. That case was investigated by the same unit investigating Mr. Wander (the Securities and Commodities Fraud Task Force), the same law enforcement agency (the FBI), and the same prosecutor. Martinez Decl. Ex. 17 (SDNY Press Release on Bankman-Fried's December 2022 arrest). The Bankman-Fried trial generated extraordinary media attention. It was covered extensively by major financial and legal outlets, *Semafor* among them. On November 2, 2023— less than four weeks before *Semafor* published its first article about the 777 Partners investigation—*Semafor* published a story on the conclusion of the Bankman-Fried trial. Martinez Decl. Ex. 18 (November 2, 2023 *Semafor* article on Bankman-Fried trial conviction).

**D.      The Harmful News Stories About 777 Partners Continued.**

The leaks did not stop with the November 2023 *Semafor* Article. On March 12, 2024, the same reporter published another article on *Semafor* (the "March 2024 *Semafor* Article") revealing details on the investigation's progress. Martinez Decl. Ex. 19. The article reported that "[p]rosecutors have interviewed current and former 777 employees, and state insurance regulators in Utah and elsewhere are also investigating [777's] insurance operations, people familiar with the matter said." *Id.* Again, this disclosure contained information not available to the public or even to any particular witness—it reflects knowledge of recent developments, and of the investigation's ongoing scope, that reasonably could have only come from someone in government.

The most detailed disclosure came on November 18, 2024, when *Josimar* published an exposé attributing its information to "[m]ultiple sources with knowledge of the matter." Martinez Decl. Ex. 20 (the "November 2024 *Josimar* Article"). *Josimar* is a Norwegian web magazine focused on journalism related to soccer, including the Premier League. Given Mr.

Wander's prominence in European sports, it had been covering him since at least July 2023.  *See* Martinez Decl. Ex. 21 (July 3, 2023 *Josimar* article).  Notably, the same unit in the U.S. Attorney's Office, the same federal agency, and the same prosecutor handled the prosecution of the owner of Premier League club Tottenham Hotspur F.C.  *See* Martinez Decl. Exs. 22 (SDNY Press Release on the July 26, 2023 arrest of the owner), 23 (July 26, 2023 *BBC News* article about the arrest of the owner).

The November 2024 *Josimar* Article opened with the statement that "[c]riminal subpoenas have been sent to employees of both 777 Partners and A-CAP[2] as part of a money laundering investigation by the US Department of Justice."  Martinez Decl. Ex. 20.  It then described the investigation as a "joint investigation by the Securities and Exchange Commission (SEC), FBI and Homeland Security."  *Id.*  The article again named the same prosecutor.  *Id.* Attributing its information to "[m]ultiple sources with knowledge of the matter," the article continued that "subpoenas have now been issued summoning multiple parties to court to give evidence."  *Id.*

The article's identification of the specific combination of agencies involved is particularly indicative of a law enforcement leak.  Even an astute party outside of government would not have known the identities of the law enforcement agencies tasked with the investigation.  The details of this article have since been confirmed:  the prosecution named the two lead enforcement agencies as the FBI and the Department of Homeland Security ("DHS"), and the SEC sued Mr. Wander the same day the indictment in this case was unsealed.  Martinez Decl. Exs. 24 (October 16, 2025 FBI Press Release about Mr. Wander's arrest); 25 (October 16, 2025 SEC Press Release about its suit against Mr. Wander).

---

[2]  A-CAP is an insurance and financial services company that had business relationships with 777 Partners.

**E.        These Stories Harmed Mr. Wander's Defense, His Businesses, and His Lenders.**

The leaks created a prejudicial environment that was inescapable for Mr. Wander's defense, his businesses, and ultimately, his lenders, the very victims the prosecution purports to protect.  Damien Alfalla, 777 Partners' former Chief Financial Officer, began cooperating with the prosecution during the midst of the news crush.  *See* Martinez Decl. ¶ 43.  The prosecution's own discovery suggests that the first interview of Mr. Alfalla occurred on May 23, 2024—after the two *Semafor* articles upended 777 Partners' business.  This sequence suggests that Mr. Alfalla's decision to cooperate during this time was not necessarily a coincidence; the media coverage may well have precipitated it.

Besides harming Mr. Wander's criminal defense, the media storm damaged 777 Partners and diminished chances of recovery to its lenders.  Counterparties and lenders flooded Mr. Wander with questions about the prosecution's investigation.  *See* Martinez Decl. Exs. 26 (December 4, 2023 email from Alfalla discussing a "Department of Justice Inquiry" and noting that counterparties "called me over the weekend regarding the [ ] DOJ article" and noting that he was nervous that "banks like Goldman and others see the article and then kick us out"); 27 (December 4, 2023 email from Alfalla to Mr. Wander and others about a counterparty "texting and asking about the DOJ article"); 28 (December 7, 2023 email from counterparty to Mr. Wander forwarding a communication about another party backing out of an investment with 777 because of the "disturbing news that has riled our investment committee" and noting that the "news of the DOJ . . .  investigating 777 for money laundering has given us great pause" and noting they had previously been "very positive about continuing the relationship"); 29 (December 14, 2023 email from counterparty noting that before they would engage with a securitization deal they would like to discuss the DOJ investigation before proceeding with any engagement with 777).  Mr. Wander and 777 Partners were wholly unprepared to answer,

because they were unaware of any such investigation.  Martinez Decl. Ex. 30 (November 30, 2023 internal 777 Partners' email).  They trusted that the government investigates crimes "through a grand jury, which is highly confidential."  *Id.*; Martinez Decl. Ex. 31 (November 30, 2023 letter from counsel for 777 Partners to *Semafor*, denying the story because of their well-grounded belief that "as a matter of well-established DOJ policy, the offices for the U.S. Attorney for the Southern District of New York and U.S. Attorney for the Southern District of Florida do not disclose to the media or other members of the public whether they have opened investigations into any entity on any subject").

The additional scrutiny from counterparties and lenders, including litigation, severely damaged potential business opportunities that could have allowed 777 Partners to resolve issues with its lenders.  Mr. Wander had businesses in insurance and specialty finance that relied on liquidity from counterparties; once the investigation leaked, relationships with regulators and stakeholders immediately seized up.  Three transactions (of many) are emblematic: an imminent transaction involving 777 Partners' affiliate TAMI, which would have produced profits of tens of millions of dollars, was substantially delayed because of counterparty concerns about the reports; 777 Partners' ongoing attempted purchase of Everton, which ultimately collapsed under the scrutiny; and 777 Partners' formal attempt to reach an appropriate arrangement with its lender Leadenhall, which was substantially harmed by the stories.

### 1.    *TAMI*

As described above, TAMI was a wholly owned subsidiary of 600 Partners.  On December 1, 2023, citing the November 2023 *Semafor* Article, two investors who were about to close a transaction with TAMI told 777 Partners' employees they would have to delay.  Martinez Decl. Ex. 6 (December 1, 2023 internal email).  The investors told 777 Partners that the delay was so that they could investigate whether, consistent with the article, 777 Partners was

10

committing money laundering.  *Id.*  The delays contributed to significant cash flow problems with 777 Partners, at a moment when liquidity was critical to repay lenders.

### 2.    *Everton*

In the fall of 2023, 777 Partners entered into a definitive agreement to purchase a 94.1% stake in Everton, one of the oldest and most illustrious clubs in the Premier League.  Martinez Decl. Ex. 5  (September 15, 2023 AP article).  777 Partners also provided liquidity that Everton needed, making loans of at least £100 million (approximately $125 million) to keep the club running.  Martinez Decl. Ex. 15 (December 6, 2023 *Bloomberg* article).  The purchase of Everton was expected to generate hundreds of millions of dollars in revenue and create significant additional equity value for the firm, which would have ultimately allowed 777 Partners access to substantial profits to repay lenders.  *See* Martinez Decl. Ex. 32 (a projected valuation document), at 12.  But senior members of the Premier League read the news stories and told Mr. Wander they "were very perplexed that the DoJ in the US are now looking into an allegation of money laundering."  Martinez Decl. Ex. 33 (December 6, 2023 email from David Dein).  When the Premier League continued its diligence of 777 Partners to determine whether the purchase should continue, the League asked 777 to respond to the allegations raised in the articles.  *Id.*  Spurred by these questions, and stalked by bad news, in the spring of 2024, 777 Partners was unable to complete the transaction, destroying hundreds of millions of dollars in implied equity and putting at risk the over £100 million that they had already lent to the club. Martinez Decl. Ex. 34 (June 14, 2024 *Athletic* article).

### 3.    *Leadenhall*

Negotiations with Leadenhall Capital were particularly affected by the media maelstrom triggered by the November 2023 *Semafor* Article.  On November 29, 2023—the same day that the *Semafor* reporter contacted 777 Partners for a comment on her story—Leadenhall sent 777

11

Partners a notice of default, but Leadenhall and 777 Partners continued negotiating to resolve the outstanding issues.[3]  *See* Martinez Decl. Exs. 35 (the Amended Complaint in *Leadenhall Capital Partners LLP v. Wander*, et al., 24 Civ. 3453, ECF No. 182 (the "Leadenhall Complaint")) ¶¶ 143, 182 (describing the ongoing "negotiations" which "dragged over efforts to work out a restructuring arrangement" after the notice of default); 36 (November 29, 2023 Notice of Default).  On February 21, 2024, the parties reached an agreement whereby 777 Partners would pay off $25.6 million of outstanding loans; 777 Partners paid off a portion of that agreed-upon sum.  Martinez Decl. Ex. 35 at ¶ 214.  Throughout March and April, 777 Partners and Leadenhall continued to discuss potential resolutions short of litigation, but ultimately, on May 3, 2024, Leadenhall sued Mr. Wander, 777 Partners, and other affiliated staff.  Martinez Decl. Ex. 37 (the initial complaint filed in the Leadenhall litigation).  Following the lawsuit and continued media pressure, Mr. Wander resigned from his roles at 777 Partners, giving up his role in a company he had built from the ground up.  Martinez Decl. Ex. 38 (May 20, 2024 *Sportcal* article).

The Leadenhall Complaint demonstrates the degree to which Leadenhall's understanding of 777 Partners' conduct was shaped by the negative news stories.  The Leadenhall Complaint cites *Semafor* and *Josimar* reporting repeatedly.  Martinez Decl. Ex. 35 ¶¶ 231, 238, 244, 255, 262–67, 269, 271–72, 304, 309.  Indeed, in the immediate aftermath of publication, a Leadenhall employee communicated with Mr. Wander about the March 2024 *Semafor* Article.  There is every reason to conclude that the news stories about the prosecution's investigation, instigated by the November 2023 *Semafor* Article, infected the negotiations with Leadenhall and made resolution on amenable terms unattainable.

---

[3] Mr. Wander is still litigating the complaint filed by Leadenhall.  Nothing in this brief constitutes an admission to any of the allegations against him in that action.  Instead, he cites Leadenhall's complaint as indication of how Leadenhall acted and interpreted their negotiations in 2023 and 2024.

**F.      Mr. Wander Requests More Information About the Disclosure from the Prosecution.**

On February 27, 2026, counsel for Mr. Wander sent a letter to the prosecution requesting assurances that its office, and the prosecution team more specifically, was not the source of these disclosures and that the prosecution team had complied with the grand jury secrecy provisions of Federal Rule of Criminal Procedure 6(e).  Martinez Decl. Ex. 39 (February 27, 2026 letter from Gibson Dunn to the prosecutors).  Mr. Wander requested that the prosecution respond by March 20, 2026.  *Id.*  The prosecution has not responded.

**LEGAL STANDARD**

Confidential criminal investigations are called that for a reason.  The government has a time-honored obligation to keep its investigations confidential, so as not to prejudice individuals who are uncharged or acquitted.  Robert H. Jackson, *The Federal Prosecutor* (1940) ("The prosecutor has more control over life, liberty, and reputation than any other person in America. . . . He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations.").

Members of a prosecution team may not "furnish any statement or information for the purpose of influencing the outcome of a defendant's trial" or provide information "which could reasonably be expected to be disseminated by means of public communication, if such a statement or information may reasonably be expected to influence the outcome of a pending or future trial."  28 C.F.R. § 50.2(b)(2); Loc. Crim. R. 23.1(a) (government agents and officers may not "release or authorize the release of nonpublic information or opinion that a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which they are associated, if there is a substantial likelihood that the dissemination will interfere with a fair trial or otherwise prejudice the due administration

13

of justice."); U.S. Dep't of Just., Justice Manual § 1-7.400(B) ("DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations.").

The standard for release of grand jury information is even more strict: a government attorney "must not disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). A knowing violation of the grand jury secrecy rules "may be punished as a contempt of court." Fed. R. Crim. P. 6(e)(7); *United States v. Walters*, 910 F.3d 11, 23 (2d Cir. 2018) ("[L]eaking of confidential grand jury information to members of the press, whether to satisfy public interest in high profile criminal prosecutions or to generate evidentiary leads, is serious misconduct and, indeed, likely criminal.").

This grand jury secrecy is a fundamental tenet of federal grand jury investigations, ensuring that witnesses testify fully and frankly, investigations are free from improper influence, and later-exonerated investigatory targets are not subjected to unnecessary exposure. *See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218–19 (1979) ("[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."). Violations of grand jury secrecy rules can be so prejudicial that they can "jeopardize[] the defendant's right to a fair trial before a petit jury." *United States v. Friedman*, 854 F.2d 535, 583 (2d Cir. 1988).

When a victim of a grand jury leak asserts the government has improperly disclosed grand jury information reported by the press, he is entitled to an evidentiary hearing if he makes out "a *prima facie* case of a violation of Federal Rule of Criminal Procedure 6(e)." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). The burden "is relatively light." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1068 n.7 (D.C. Cir. 1998). Among other non-exhaustive factors, the Second Circuit has indicated that courts should examine "(1) whether the media

14

reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e)." *Rioux*, 97 F.3d at 662.

The identities of recipients of grand jury subpoenas are a "matter occurring before the grand jury," Fed. R. Crim. P. 6(e)(2)(B), because those recipients are likely to testify before the grand jury. *See, e.g.*, *Comm. on Judiciary, U.S. House of Representatives*, 332 F.R.D. 412, 415–16 (D.D.C. 2019) ("That an individual's testimony was subpoenaed by the grand jury is also a 'matter occurring before the grand jury.' . . . [W]hile the grand jury is ongoing, a potential witness's identity is protected insofar as that witness's testimony has been subpoenaed. Secrecy is also warranted where the testimony is otherwise likely, as in 'about to be presented' or 'not yet delivered but clearly anticipated.'"); *see also United States v. Adams*, 755 F. Supp. 3d 519, 530 n.8 (S.D.N.Y. 2024) (recognizing that "[a] number of courts, including one district court in this Circuit, have held or suggested that" conclusion).

To determine whether a defendant has made a *prima facie* case that the media report discloses the source as one prohibited by Rule 6(e), the court "look[s] at the information contained in the articles or news reports presented in support of the motion." *United States v. Skelos*, 2015 WL 6159326, at *11 (S.D.N.Y. Oct. 20, 2015). Courts recognize the commonsense principle that in a grand jury leak, the prosecution may not be explicitly quoted in the news articles, in which case the defendant meets his burden if he shows that "the nature of the information disclosed therein makes clear the connection." *Id.*; *see also Barry v. United States*, 865 F.2d 1317, 1325 (D.C. Cir. 1989) (same).

Finally, the court can consider evidence the government has submitted to determine if the defendant has met his burden. In numerous cases in this Circuit in which a defendant has

15

accused the government of leaking grand jury information, courts have ordered or the government has volunteered sworn affidavits from members of the prosecution team denying they had made an unauthorized disclosure. *See Skelos*, 2015 WL 6159326, at *11 ("The Government has also submitted an affidavit signed by all government attorneys 'in charge of this prosecution and who attended the grand jury presentations, as well as case investigating agents and investigators' affirming that none of them spoke to any member of the press about information relating to the investigation."); *Adams*, 755 F. Supp. 3d at 531 ("the Government has submitted a declaration affirming that none of the Assistant United States Attorneys, FBI Special Agents, or New York City Department of Investigation Deputy Investigators General assigned to Mayor Adams's case 'disclosed information they learned in the course of the Investigation to any member of the press.'"); *United States v. Nordlicht*, 2018 WL 6106707, at *5 (E.D.N.Y. Nov. 21, 2018) ("the Government has affirmed that each of the government attorneys and agents who actively supervised the investigation did not disclose to any member of the press information obtained as a result of the grand jury investigation in this case."). Critically, the government's failure to provide such an affidavit weighs strongly in favor of the moving defendant. *E.g.*, *In re Grand Jury Investigation*, 610 F.2d 202, 220 (5th Cir. 1980) (ordering an evidentiary hearing where "[u]nlike prior cases, the Justice Department and the United States Attorney's office refused a request by Lance that they submit affidavits denying" disclosure).

If the defendant has met his *prima facie* burden, "the district court must conduct a 'show cause' hearing to determine whether the Government was responsible for the pre-indictment publicity and whether any information disclosed by the Government concerned matters occurring before the grand jury. At this hearing, the burden shifts to the Government to come forward with evidence to negate the prima facie case." *Barry*, 865 F.2d at 1321. If the court determines the

16

government did unlawfully disclose information, the court can grant a range of relief, including dismissal of the indictment, *United States v. Walters*, 910 F.3d 11, 22–23 (2d Cir. 2018), suppression of evidence, *United States v. Coughlan*, 842 F.2d 737, 740 (4th Cir. 1988), contempt, Fed. R. Crim. P. 6(e)(7), and other equitable relief, *Barry*, 865 F.2d at 1321.  The scope of relief depends on the seriousness of the prejudice the defendant suffered.  *Walters*, 910 F.3d at 22–23.

Separate and apart from a defendant's right to grand jury secrecy under Rule 6(e), courts have the supervisory power to hold an evidentiary hearing about misconduct involving the grand jury.  *See, e.g., United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir. 1976) (affirming suppression of testimony and dismissal of a charged count for misconduct before a grand jury).  Courts have provided various forms of relief to defendants who have suffered such misconduct.  *E.g., id.*; *United States v. Leeper*, 2006 WL 1455485, at *4–5 (W.D.N.Y. May 22, 2006) (dismissing indictment after finding of grand jury misconduct).  "A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government," which "permits factual determinations to be made by the district judge" about that process.  *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991).

## ARGUMENT

I.    **Mr. Wander Has More Than Established a *Prima Facie* Showing of Violations of the Grand Jury Secrecy Rule.**

Mr. Wander more than satisfies the "relatively light" burden to make out a *prima facie* case.  *Sealed Case*, 151 F.3d at 1068 n.7.  Each of the three factors identified in *Rioux* weighs in his favor: the articles disclosed protected grand jury information; the nature of that information points unmistakably to a source within the prosecution; and the prosecution has submitted nothing to rebut the inference of a violation.  *See* 97 F.3d at 662.

17

*First*, the media reporting throughout this case repeatedly disclosed protected information.  That is clear from the face of the November 2024 *Josimar* Article, which opens with a direct statement that criminal subpoenas had been sent to employees of both 777 Partners and A-CAP.  Martinez Decl. Ex. 20.  That is, at bottom, a disclosure of a matter occurring before the grand jury.  *Comm. on Judiciary*, 332 F.R.D. at 415–16.  The earlier articles involved disclosures of grand jury material as well.  The reporter of the November 2023 *Semafor* Article described the investigation by the government as "formal"—consistent with a grand jury investigation—and identified the specific statutory provisions under investigation and the identity of the prosecutor.  Martinez Decl. Exs. 7 (November 29, 2023 email from *Semafor* reporter); 8 (November 2023 *Semafor* Article).  The March 2024 *Semafor* Article went further, identifying categories of individuals who had been interviewed by the prosecution.  Martinez Decl. Ex. 19 (March 2024 *Semafor* Article).  Witness interviews—even outside of the presence of the grand jury—which are later intended to be presented to the grand jury are paradigmatic grand jury material.[4]  *In re Grand Jury Matter*, 697 F.2d 511, 512 (3d Cir. 1982).  All this information is precisely that which "may tend to reveal what transpired before" the grand jury.  *Adams*, 755 F. Supp. 3d at 525.[5]

*Second*, the nature of the information disclosed in the articles makes clear that the source was connected to the prosecution.  *See Skelos*, 2015 WL 6159326, at *11.  The articles highlight the following facts:

---

[4] By the time of the March 2024 *Semafor* Article, the grand jury had undeniably been convened and was investigating, since subpoenas had begun to be issued by no later than February 8, 2024.  Martinez Decl. Ex. 10 (February 8, 2024 subpoena).

[5] Unlike *Adams*, there is no indication that the sources in the stories published here were revealing matters from any "parallel" criminal investigation.

- the specific identity of the lead prosecutor, as published in the November 2023 *Semafor* Article and November 2024 *Josimar* Article;

- the statutory provisions then under investigation, as published in the November 2023 *Semafor* Article;

- that the prosecution was discussing a joint investigation with law enforcement in Miami, as published in the November 2023 *Semafor* Article;

- that current and former 777 employees had been interviewed as part of the investigation, as published in the March 2024 *Semafor* Article;

- that grand jury subpoenas had been issued to employees of 777 Partners and A-CAP, as published in the November 2024 *Josimar* Article;

- that the investigation was jointly run by the FBI and DHS, as published in the November 2024 *Josimar* Article.

*See* Martinez Decl. Exs. 8 (November 30, 2023 *Semafor* Article); 19 (March 12, 2024 *Semafor* Article); 20 (November 18, 2024 *Josimar* article).

The prosecution's own discovery helps establish that these disclosures could only have come from inside the government. The discovery references no subpoenas issued before February 8, 2024. *See* Martinez Decl. Ex. 10 (February 8, 2024 subpoena issued to 777 Partners). That means that at the time of the first article — November 2023—no subpoena recipient existed who could have identified the lead prosecutor or the statutory provisions under investigation. The only person who could have provided that information was someone already inside the investigation. That inference is confirmed, not undermined, by the subsequent corroboration: the February 8, 2024 and June 5, 2024 subpoenas were issued by the very prosecutor named in the November 2023 article, and the latter listed money laundering among

19

the alleged violations, exactly as the article had reported.  *See* 18 U.S.C. § 1956; Martinez Decl. Ex. 11 (June 5, 2024 subpoena issued to 777 Partners).  The articles did not anticipate the investigation—they described it from the inside.

The disclosure of discussions about a joint investigation with law enforcement in Miami deserves particular attention, because it is the one that most clearly points to a government source.  The November 2023 *Semafor* Article reported that the prosecution was considering a joint investigation with law enforcement in Florida, and the picture accompanying the article was of the lead prosecutor with the headline "Turf Battle."  Martinez Decl. Ex. 12 (November 2023 *Semafor* Article).  That is not information that would appear in a subpoena or be shared with a witness.  It reflects inside baseball—a conversation about investigative turf and interagency coordination that could only have taken place within the prosecution team, and that could only have been disclosed by someone who was part of it.  The disclosure of that detail alone is sufficient to support the inference that the source of the leak was inside the government.

The November 2024 *Josimar* Article's identification of the precise agencies conducting the investigation only further buttresses that conclusion.  Reporting that the investigation was a joint effort of the SEC, the FBI and DHS Investigations—not merely "federal investigators" or "law enforcement," but the specific combination of agencies—reflects knowledge that is usually unavailable outside the government.  *See* Martinez Decl. Ex. 20.  Discovery later confirmed that the FBI and DHS were indeed the two lead agencies, and the SEC filed its civil suit on the same day the indictment was unsealed.  Martinez Decl. Exs. 24, 25 (FBI and SEC Press Releases).  That level of accuracy is not the product of informed speculation.  It is the product of inside knowledge.

20

Further, it is a reasonable inference that someone connected to the prosecution team would have incentive to disclose this information to the news media.  These disclosures could serve at least two purposes for law enforcement.  First, public reporting that the investigation involved multiple federal agencies—including DOJ, the FBI, and DHS—and one of the most active U.S. Attorney's Offices in the country, would send a powerful message to potential witnesses about the seriousness and reach of the investigation, creating pressure on resistant witnesses to cooperate.  The timing of Mr. Alfalla's cooperation, which began in the wake of the press coverage, suggests that pressure may have worked exactly as intended.  *See* Martinez Decl. ¶ 42.  Second, the stories could serve to dissuade and deter other agencies that might have been interested in opening a competing investigation, consolidating the prosecution team's control over the matter—a fact perfectly noted by the November 2023 *Semafor* Article's use of the words "turf battle" over a photo of the lead prosecutor.  *See* Martinez Decl. Ex. 8.

The underlying context of the November 2023 *Semafor* Article provides further information showing the prosecution team's familiarity with—and comfort operating in—a high-profile media environment.  As the article states on its face, the same prosecutor had recently concluded the trial of Sam Bankman-Fried, one of the most media-saturated financial fraud prosecutions in recent memory. Martinez Decl. Ex. 8.  *Semafor* and several of the other outlets that published leaks about Mr. Wander had closely covered the Bankman-Fried trial, the U.S. Attorney's Office, and the then-U.S. Attorney himself.  Throughout the proceedings, the U.S. Attorney's Office had been actively engaging with the press corps about Bankman-Fried.  *See* Martinez Decl. Exs. 18 (*Semafor* article about Bankman-Fried trial), 40 (April 13, 2023 *New York Times* article) (interview with the then-U.S. Attorney while the Bankman-Fried charges were pending, which included questions about that case).  As previously noted, the reporter from

21

*Semafor* has an ongoing relationship with the U.S. Attorney's Office, and the lead prosecutor, which continues to this day. Against that backdrop, the appearance of a detailed, sourced article about Mr. Wander's investigation in *Semafor*—published by the same reporter, drawing on the same unit at the U.S. Attorney's Office—is not a coincidence to be explained away. It is a pattern to be examined.

Finally, the prosecution has presented *nothing* to demonstrate they did not leak the information. Mr. Wander requested confirmation on February 27 that the prosecution team was not the source of the disclosures. Martinez Decl. Ex. 39 (February 27, 2026 letter to the prosecutors). There is still no response. That alone is a powerful factor weighing in favor of an evidentiary hearing. *In re Grand Jury Investigation*, 610 F.2d at 220.

Given the clear indicia on the face of the news articles published about Mr. Wander and his companies, he has easily cleared the low bar to provide a *prima facie* case of a violation of the grand jury secrecy rules.

Courts in this district have ordered hearings on similar facts. The background of *United States v. Walters*, is instructive. 910 F.3d 11. There, as here, the defendant moved for an evidentiary hearing after a series of detailed press articles disclosed the contents of an active grand jury investigation. The government initially opposed the motion, arguing that the defendant could not show that the source of the leaked information was a government agent or attorney and that "natural and logical inferences lead to the conclusion that the source was not a Government official." *Walters*, 910 F.3d at 19 (citing government's brief to Judge Castel). Judge Castel ordered a hearing anyway. *Id.*; *United States v. Walters*, 16 Cr. 338, ECF No. 46. It was only in response to that order—a few days before the scheduled hearing—that the government conducted a genuine internal inquiry, interviewing agents and AUSAs and collecting

22

phone records, emails, and text messages. *Walters*, 910 F.3d at 19–20. That inquiry revealed what the government's initial opposition had obscured: that an FBI supervisor had been leaking confidential grand jury information to reporters for over a year. The government then acknowledged that "it is now an incontrovertible fact that FBI leaks occurred, and that such leaks resulted in confidential law enforcement information about the Investigation being given to reporters." *Id.*; *United States v. Walters*, 16 Cr. 338, ECF No. 65-1.

The lesson of *Walters* is plain: a government denial of a leak allegation, standing alone, is not a sufficient basis to deny a defendant an evidentiary hearing. It took a court order in *Walters* to surface the truth. Mr. Wander is entitled to the same opportunity, particularly because the prosecution has not even denied the leak. In the alternative, the Court should order an evidentiary hearing under its supervisory powers. *Jacobs*, 547 F.2d at 778.

## II.    Scope of an Evidentiary Hearing.

At an evidentiary hearing, Mr. Wander will seek to establish: *first*, that the prosecution was the source of the unlawful disclosures; *second*, that the disclosures prejudiced him. *E.g.*, *Walters*, 910 F.3d at 23 (describing need to show prejudice to seek dismissal of indictment). In order to establish that the prosecution was the source, Mr. Wander will request discovery from the prosecution, including first and foremost affidavits from the prosecution team on the matter during the investigation, including the line prosecutors, their supervisors, and law enforcement personnel; emails and documents, including text messages, interview memoranda, summaries, or other records showing communications between the prosecution and *Josimar*, *Semafor*, or other journalists regarding this investigation; cellular phone records showing communications between prosecution team members and *Josimar*, *Semafor*, or other journalists regarding this investigation; social media messages, including direct messages, between prosecution team members and *Josimar*, *Semafor*, or other journalists regarding this investigation; or any other

23

documents or records evidencing communications between the prosecution and any members of the media regarding this investigation. Mr. Wander also requests any other information in the prosecution's records about the identity of any other person who acted a source to the media, for the articles cited or any others.

Mr. Wander is not obligated in this motion for an evidentiary hearing to provide any information to suggest he was prejudiced by the disclosures. *See Rioux*, 97 F.3d at 662 (listing the three elements above as the only factors a defendant must show); *accord Adams*, 755 F.Supp.3d at 523 n.4 (describing disputed case law about the need to show prejudice). At a hearing and given the opportunity, as described throughout this motion, Mr. Wander expects to provide ample support for the prejudice he suffered. First, there is every reason to believe that the media stories put Damien Alfalla under the spotlight and prompted his cooperation. Prosecution misconduct that precipitates witness cooperation may constitute prejudice. *See, e.g.*, *Walters*, 910 F.3d at 18–19, 23–24 (assuming without deciding that precipitation of cooperation is prejudicial for purposes of Rule 6(e)).[6] Second, Mr. Wander suffered severe economic harm. The news stories directly harmed the financial condition of 777 Partners over the course of 2024. *See, e.g.*, Indictment ¶ 23. The factual record makes clear that the media dissuaded potential counterparties; delayed and ultimately torpedoed the Premier League's approval of Mr. Wander's Everton bid, making it impossible for 777 Partners to resolve its financial issues; and triggered the breakdown of negotiations with one of its principal lenders, leading to the lawsuit in May 2024.

---

[6] Unlike in *Walters*, the last story containing leaked information was published just weeks before Alfalla began cooperating, at least as can be determined from the prosecution's discovery at this point; whereas in *Walters* the last story was six months before the cooperator began to proffer with the prosecution.

Mr. Wander is not requesting any specific relief at this point. All he asks from this Court is an opportunity: the opportunity to confirm whether this prosecution team violated the law, and if so, the opportunity to show this court how that violation harmed him. After an evidentiary hearing, Mr. Wander respectfully requests the opportunity to move the Court for appropriate relief.

## CONCLUSION

For the foregoing reasons, Mr. Wander respectfully requests that the Court order an evidentiary hearing in connection with the prosecution's leaks of grand jury material and other confidential information.

Dated: April 7, 2026                            Respectfully submitted,

*/s/ Jordan Estes*
Jordan Estes
Michael Martinez
Samuel Raymond
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
JEstes@gibsondunn.com
MMartinez2@gibsondunn.com
SRaymond@gibsondunn.com

*Attorneys for Joshua Wander*

25

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York because it is 8,218 words (exclusive of the table of contents and authorities); and

2.      This document complies with the typeface requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York  because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 12-point Times New Roman font, with footnotes that are at least 10-point font.

*/s/ Jordan Estes*
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY
10166
(212) 351-2315
JEstes@gibsondunn.com

26