# EXHIBIT 1

**Thomas P. Smith, Jr.**
**Rebecca Reilly**
**Ben Kuruvilla**
**Nicholas Flath**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-5599 (Kuruvilla)**
**kuruvillabe@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOSHUA WANDER,**<br>**STEVEN PASKO,**<br>**DAMIEN ALFALLA,**<br>**777 PARTNERS LLC, and**<br>**600 PARTNERS LLC,**<br><br>**Defendants.** | **<u>COMPLAINT</u>**<br><br>**25 Civ. 8565**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission"), for its Complaint against Joshua Wander ("Wander"), Steven Pasko ("Pasko"), Damien Alfalla ("Alfalla"), 777 Partners LLC ("777 Partners"), and 600 Partners LLC ("600 Partners") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1. Between January 2021 and May 2024 (the "Relevant Period"), Defendants fraudulently solicited investments in a preferred equity offering (the "Offering") that 777 Partners and 600 Partners (together, the "Issuers") jointly issued, and that raised approximately

$237 million from 13 investors. Defendants Wander and Pasko were the co-founders and managers of the Issuers; Alfalla was the chief financial officer ("CFO") of both entities. Wander, Pasko, and Alfalla managed the Issuers as a unified business; the Issuers reported their financial statements on a consolidated and combined basis.

2. During the Relevant Period, Defendants misled investors about the Issuers' financial condition, and fraudulently induced investments in the Offering, by falsely representing that the Issuers were earning, and would continue to earn, substantial positive net income sufficient to pay investors a 10% annual dividend. In truth, Wander and Alfalla knew or recklessly disregarded, and Pasko knew or should have known, that the Issuers were in a severe and worsening liquidity crisis and had no realistic prospects of earning net income sufficient to pay the dividend.

3. At the heart of the Issuers' dire financial situation was the misuse and resulting $300 million overdraw of a credit facility (the "Credit Facility") in breach of the Credit Facility's terms. The borrowers under the Credit Facility were certain limited liability companies that were subsidiaries of SuttonPark Capital LLC (together with its subsidiaries, "SuttonPark"). SuttonPark was 600 Partners' largest subsidiary and the largest operating company within the Issuers' business. Prior to the Relevant Period, SuttonPark's profits made up a significant portion of the Issuers' profits. By diverting cash and other collateral from the Credit Facility, the Issuers compromised SuttonPark's ability to generate profits, and thus compromised the Issuers' own financial health. Moreover, the Issuers concealed the misuse and overdraw from the Credit Facility lender.

4. Wander directed the misuse of the Credit Facility and the concealment of the overdraw from the lender. Alfalla helped carry out these activities. Pasko, who in addition to

co-founding and managing both 777 Partners and 600 Partners, was also the chief executive officer ("CEO") of SuttonPark, knew or should have known of the overdraw, and yet signed Credit Facility compliance reports for transmission to the lender without verifying their accuracy or completeness. In fact, such reports were false and misleading.

5. Because of the overdraw of the Credit Facility, the Issuers would have had to generate $300 million to repay the Credit Facility lender before they could begin earning profits to pay dividends to investors in the Offering. By summer 2021, there was no realistic prospect that the Issuers could do so, and the Issuers' financial outlook only worsened as time passed and the Issuers continued to raise money from additional investors using materially false and misleading information.

6. In marketing the Offering, Defendants Wander and Alfalla made false and misleading representations about the Issuers' prospects and ability to pay dividends, while concealing the $300 million overdraw from investors, as well as its causes. Alfalla drafted slides used in an investor presentation (the "Investor Presentation"), and related supporting diligence materials (the "Diligence Materials"), which falsely represented that the Issuers anticipated they would continue to earn substantial positive net income. Wander reviewed and approved the Investor Presentation and Diligence Materials before they were sent to investors. Wander also participated in phone calls with prospective investors in which he reinforced the false and misleadingly positive picture of the Issuers' prospects.

7. As a board member of 600 Partners and 777 Partners, Pasko signed board consents approving the form, terms, and provisions of the Subscription Agreement (which incorporated the Investor Presentation and Diligence Materials by reference); Pasko also signed each investor's Subscription Agreement on behalf of 600 Partners and 777 Partners. Though he

knew or should have known of the overdraw of the Credit Facility and its serious effects on the Issuers' prospects, Pasko did not take steps to ensure the accuracy or completeness of the Investor Presentation and Diligence Materials, or the term sheet embodying the terms of the Offering (the "Term Sheet").

8. Wander also misled investors about how the Issuers would use the Offering proceeds. Wander falsely represented in the Investor Presentation and in the Term Sheet that the Issuers would use the Offering proceeds for general corporate purposes. In fact, Wander intended to, and ultimately did, cause the Issuers to divert approximately $33 million of investor funds to Wander and Pasko personally. Specifically, in September 2021, after receiving Offering proceeds from investors, the Issuers (on Wander's instructions) sent approximately $24.9 million to Wander's personal bank account and approximately $8.03 million to Pasko's personal brokerage account.

9. The Issuers never remedied the overdraw of the Credit Facility, and the Issuers' financial condition continued to worsen. The Credit Facility lender eventually discovered the misuse and overdraw, and commenced litigation. In 2024, Wander, Pasko, and Alfalla resigned from their roles at 777 Partners and 600 Partners and their subsidiaries, and a restructuring adviser was engaged to manage the Issuers. The investors in the Offering have suffered substantial pecuniary harm as a result of Defendants' actions.

## VIOLATIONS

10. By virtue of the foregoing conduct and as alleged further herein, Defendants Wander, 777 Partners, and 600 Partners violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11. By virtue of the foregoing conduct and as alleged further herein, Defendant Alfalla violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12. By virtue of the foregoing conduct and as alleged further herein, Defendant Pasko violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

13. Unless Defendants are restrained and enjoined, they are likely to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

14. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

15. The Commission seeks a final judgment:

a. permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (d)(5)];

b. ordering Wander, 777 Partners, and 600 Partners, jointly and severally, to disgorge all ill-gotten gains Wander received as a result of the violations alleged here and to pay prejudgment interest thereon on a joint and several basis pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)];

c. ordering Pasko, 777 Partners, and 600 Partners, jointly and severally, to disgorge all ill-gotten gains Pasko received as a result of the violations alleged here and to pay prejudgment interest thereon on a joint and several basis pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)];

d. ordering Defendants Wander, Alfalla, 777 Partners, and 600 Partners to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

e. ordering Defendant Pasko to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)];

f. permanently prohibiting Wander and Alfalla from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

g. permanently prohibiting Pasko from serving as an officer or director of a public company pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)];

h. permanently prohibiting Wander, Pasko, and Alfalla from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunctions shall not prevent them

from purchasing or selling securities for their own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)]; and

i. ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

17. Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the means and instruments of transportation or communication in interstate commerce in connection with the transaction, acts, practices, and courses of business described in this Complaint.

18. Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business described in this Complaint occurred within this district. Among other things, at least four investors who participated in the Offering were in this district when Defendants marketed the Offering to them and they invested.

**DEFENDANTS**

19. **777 Partners** is a Delaware limited liability company based in Miami, Florida. Wander and Pasko formed 777 Partners in May 2015. Throughout the Relevant Period, Wander and Pasko controlled 777 Partners by virtue of their equity ownership and management roles. At the beginning of the Relevant Period, Wander indirectly owned approximately 48% of 777 Partners and Pasko indirectly owned 25%; by the end of the Relevant Period, Wander had acquired 78%, leaving Pasko with the remaining 22%. Under 777 Partners' LLC agreement,

Wander and Pasko had the right to appoint three members to 777 Partners' five-member board; Wander, Pasko, and Alfalla served as the management members of the board. In addition, Wander and Pasko served as co-managing partners of 777 Partners, and Alfalla served as 777 Partners' CFO.

20. **600 Partners** is a Delaware limited liability company based in Miami, Florida, at the same premises as 777 Partners. Wander and Pasko formed 600 Partners in January 2017. Throughout the Relevant Period, Wander and Pasko controlled 600 Partners. At the beginning of the Relevant Period, Pasko indirectly owned approximately 65% of 600 Partners; by the end of the Relevant Period, Pasko indirectly owned 100% of 600 Partners. Pasko had the right to appoint three members of 600 Partners' five-member board. Pasko served on the board of 600 Partners, as did Alfalla and another management designee. Pasko also served as the sole managing partner of 600 Partners, and Alfalla served as 600 Partners' CFO. Wander, though not a member of 600 Partners, had a contractual participation interest in 600 Partners that was economically equivalent to 74% of Pasko's equity interest, as well as a contractual right to be consulted concerning significant decisions about 600 Partners' operations. In addition, though Wander had no official title at 600 Partners, Wander and Pasko managed 600 Partners and 777 Partners as a combined business (and reported their financials on a combined and consolidated basis), and Wander and Pasko managed the operating subsidiaries owned by 600 Partners, including SuttonPark.

21. **Wander**, age 44, resides in Miami, Florida. During the Relevant Period, Wander (along with Pasko) controlled 777 Partners through his equity interest, his role on the board, and his role as one of 777 Partners' two managing partners. Wander was also involved in the management of 600 Partners and its operating subsidiaries. Wander resigned from the board and

management of 777 Partners on May 6, 2024. At all times relevant to the complaint, Wander was acting in his official capacity or acting in furtherance of the business of 777 Partners and 600 Partners.

22. **Pasko**, age 77, resides in Miami, Florida. During the Relevant Period, Pasko (along with Wander) controlled 777 Partners and 600 Partners through his equity interest in 777 Partners, his equity interest in 600 Partners, his role on the boards of 777 Partners and 600 Partners, his status as co-managing partner of 777 Partners, and his role as the sole managing partner of 600 Partners. Pasko resigned from the boards and management of 777 Partners and 600 Partners on May 6, 2024. At all times relevant to the Complaint, Pasko was acting in his official capacity or acting in furtherance of the business of 777 Partners and 600 Partners.

23. **Alfalla**, age 49, resides in Miami Beach, Florida and, through May 31, 2025, was a New York-registered Certified Public Accountant ("CPA"). During the Relevant Period prior to February 2024, Alfalla served as the CFO of 777 Partners and 600 Partners and served on the boards of both companies. Alfalla resigned from his positions at 777 Partners and 600 Partners effective February 15, 2024. At all times relevant to the Complaint, Alfalla was acting in his official capacity or acting in furtherance of the business of 777 Partners and 600 Partners.

## OTHER RELEVANT ENTITY

24. **SuttonPark** is a Delaware limited liability company with its principal place of business in Florida. During the Relevant Period, 600 Partners owned more than 99% of the equity in SuttonPark. During the Relevant Period, Pasko served as the CEO and managing partner of SuttonPark.

## FACTS

## I. BACKGROUND

### A. The Issuers Relied on SuttonPark to Generate Income

25. Wander and Pasko founded 777 Partners and 600 Partners as private holding companies with operating subsidiaries in various industries, including consumer and commercial finance, insurance, aviation, and media and entertainment.

26. The largest operating company in the Issuers' business organization, held as a subsidiary of 600 Partners, was SuttonPark, a consumer and commercial finance company. SuttonPark bought annuities (which had originated as tort claim settlements or lottery payouts) and then either securitized or resold them.

27. As of year-end 2020, SuttonPark accounted for over 50% of the Issuers' total balance-sheet assets, and over 40% of the Issuers' total members' equity. SuttonPark was also a significant contributor to the Issuers' net income. In 2020, SuttonPark generated $184 million in net income, while the Issuers as a whole generated only $69 million in net income. In other words, SuttonPark's profitability made up for losses incurred by the Issuers' other operating subsidiaries, and enabled the Issuers to post positive net income for the year.

28. As SuttonPark's CEO and managing partner, among other things, Pasko signed documents for SuttonPark and its subsidiaries and approved cash movements to and from SuttonPark.

29. Despite having no official title at SuttonPark, Wander (with Pasko) exercised control over SuttonPark.

30. Alfalla managed intra-company cash movements, including movements of cash to and from SuttonPark, and also managed SuttonPark's audits.

**B. SuttonPark Relied on the Credit Facility**

31. SuttonPark relied on loans to purchase annuities. One of SuttonPark's largest lenders was Lender A, which provided the Credit Facility to SuttonPark. Lender A first provided the Credit Facility in March 2017, and renewed it in May 2021.[1] The Credit Facility was a line of credit secured by the annuities that SuttonPark owned and pledged to the Credit Facility; the credit limit was based on the value of these annuities.

32. The Credit Facility had safeguards to protect Lender A. Pursuant to the Credit Facility, among other things, SuttonPark committed to use borrowed funds only to buy annuities, and to pledge such annuities as collateral to secure the loan. SuttonPark further committed not to allow any "Adverse Claim" against the annuities, which included, among other things, any security interest against the collateral. SuttonPark thereby committed not to double-pledge any of the Credit Facility annuities as collateral for any other loan. In addition, SuttonPark committed to deposit all funds generated by the annuities into a "Collections" bank account ("Collections Account"), and only to withdraw funds from the Collections Account after SuttonPark had paid all required fees, interest payments, and amortization payments to Lender A. SuttonPark also committed to deliver monthly compliance reports to Lender A itemizing and valuing the annuities pledged as collateral.

33. Wander was familiar with the terms of the Credit Facility and interacted with Lender A on behalf of SuttonPark. Alfalla was familiar with the terms of the Credit Facility and managed the Issuers' cash transactions, including those involving SuttonPark and funds received from Lender A. Pasko knew or should have known of the terms of the Credit Facility because he

[1] When the parties renewed the Credit Facility in 2021, they expanded it to encompass both a loan to SuttonPark and similar loans to subsidiaries of 777 Partners.

executed the 2017 Credit Facility agreement and the 2021 Credit Facility agreement on behalf of SuttonPark.

34. Wander and Alfalla knew or recklessly disregarded, and Pasko knew or should have known, that the Issuers' profitability depended on SuttonPark, and that SuttonPark's profitability depended on continued access to loans to finance its purchases of annuities, including the Credit Facility. Thus, Wander and Alfalla knew or recklessly disregarded, and Pasko knew or should have known, that a threat to the Credit Facility would jeopardize SuttonPark and the Issuers.

**C. The Issuers, Through Wander and Alfalla, Misused the Credit Facility**

35. Beginning in approximately 2020, and continuing throughout the Relevant Period, Wander and Alfalla misused the Credit Facility in at least three ways, resulting in an overdraw on the Credit Facility.

36. First, Wander diverted Credit Facility cash for purposes other than the purchase of annuities, thereby increasing the amount due under the Credit Facility without acquiring collateral to support the debt. Alfalla assisted Wander by directing the Issuers' employees to effect Wander's desired cash movements. Specifically, between January 2020 and September 2021, Wander and Alfalla caused more than $100 million that SuttonPark had borrowed from the Credit Facility to be diverted to the Issuers, for purposes other than the purchase of annuities, in violation of the Credit Facility's "use of proceeds" provision.

37. Second, Wander diverted cash collateral from the Collections Account. Between January and September 2021, Wander directed more than two dozen disbursements from the Collections Account to the Issuers. Alfalla assisted Wander by directing the Issuers' employees to effect Wander's desired cash movements in violation of the Credit Facility agreement regarding the Collections Account. Alfalla directed the Issuer's employees to characterize these

Case 1:25-cr-00475-PVM Document 2 Filed 10/16/25 Page 13 of 29

disbursements as "loans" from the Credit Facility to the Issuers on a spreadsheet. By September 2021, because of these disbursements of Credit Facility cash collateral, the "loan" balance that the Issuers owed to the Credit Facility was almost $80 million.

38. Third, Wander caused SuttonPark to pledge to other lenders annuities that served as collateral for the Credit Facility, thereby double pledging the collateral in violation of the Credit Facility's prohibition on "Adverse Claims" and leaving multiple credit facilities under-secured. By September 2021, Wander had caused double pledging of annuities then valued at more than $146.6 million. Wander caused SuttonPark to double-pledge additional annuities throughout the Relevant Period.

39. As a result of these three forms of misuse (*i.e.*, misuse of borrowed funds, misuse of cash collateral, and double pledging), by September 2021, the Credit Facility was overdrawn by approximately $300 million, and SuttonPark lacked sufficient collateral to secure this debt and/or SuttonPark's other debts incurred using the same collateral.

### D. Wander and Alfalla Concealed the Misuse and Overdraw of the Credit Facility and Damaged the Issuers' Financial Prospects

40. Wander and Alfalla directed employees of the Issuers to conceal the misuse of the Credit Facility and the overdraw from Lender A. For instance, in February and March 2021, Wander and Alfalla directed employees of the Issuers to transmit false and misleading compliance reports to Lender A that misstated the amount of cash collateral in the Collections Account. Later, Wander and Alfalla directed employees of the Issuers to transmit compliance reports that falsely listed, as collateral, the annuities that had been double pledged.

41. Wander and Alfalla's concealment of the misuse of the Credit Facility from Lender A continued until at least 2023, and as explained further below, enabled Wander and

Alfalla to deceive and mislead prospective investors in the Offering about the Issuers' financial prospects.

42. Wander and Alfalla knew, or recklessly disregarded, that the overdraw of the Credit Facility was detrimental to the Issuers' finances and prospects. Historically, the Issuers had relied on the Credit Facility (and other similar loans) to enable SuttonPark to purchase annuities, which generated profits for SuttonPark and, consequently, for the Issuers. By misusing the Credit Facility for purposes other than buying annuities, the Issuers jeopardized their ability to continue generating profits.

**E. Pasko Knew or Should Have Known of the Overdraw**

43. Pasko knew or should have known of the growing overdraw of the Credit Facility based on communications he received from Alfalla. For example, in December 2020, Alfalla sent Wander and Pasko a spreadsheet indicating a large "discrepancy" between the collateral tabulated in a draft Lender A compliance report versus the actual collateral. Then, in February 2021, Alfalla told Pasko and Wander via chat that "the deficit is like $75m." In September 2021, Alfalla told Wander and Pasko, again via chat, that the overdraw was more than $300 million.

44. Though he knew or should have known of the overdraw of the Credit Facility, throughout the Relevant Period, Pasko signed borrowing requests for transmission to Lender A, as well as Credit Facility compliance reports, without confirming whether the representations in those borrowing requests and compliance reports were accurate and complete. Pasko knew or should have known that the borrowing requests and compliance reports were misleading in that they misrepresented the amount of collateral supporting the Credit Facility and concealed the overdraw from Lender A.

45. In addition, as the CEO and managing partner of SuttonPark, and as a co-founder and executive of the Issuers, Pasko also knew or should have known of the negative effect of the overdraw on the Issuers' financial prospects.

## II. THE OFFERING

46. By the beginning of the Relevant Period, the Issuers needed capital to refinance their debts and fund their commitments. Wander and Pasko, in consultation with Alfalla, decided to address this need for capital by conducting the Offering.

### A. Structure, Terms, and Timing of the Offering

47. Beginning in summer 2021, the Issuers marketed the Offering to prospective investors. To conduct the Offering, the Issuers hired a broker-dealer to act as a placement agent ("Placement Agent A"). The Offering was an issuance of preferred equity units. Each "unit" consisted of a membership interest issued by 777 Partners and a membership interest issued by 600 Partners, making them joint issuers. According to the Offering terms, these units entitled the holders to receive 10% annual dividends.

48. The Offering terms were set forth in the Term Sheet. Investors indicated their interest in participating in the Offering by signing a subscription agreement (the "Subscription Agreement"). The Subscription Agreement incorporated the Term Sheet by reference.

49. As members of the board of directors of 777 Partners, Wander, Alfalla, and Pasko signed a consent creating the new class of preferred equity units in 777 Partners, approving the "form, terms and provisions" of the Subscription Agreement, and authorizing the issuance of preferred equity units to investors pursuant to the Subscription Agreement.

50. As members of the board of directors of 600 Partners, Alfalla and Pasko signed a consent creating the new class of preferred equity units in 600 Partners, approving the "form,

terms and provisions" of the Subscription Agreement, and authorizing the issuance of preferred equity units to investors pursuant to the Subscription Agreement.

51. The Issuers raised a total of approximately $237 million in the Offering, from 13 investors, in four successive capital raises. On September 21, 2021, eight investors invested $211 million in the Offering, including an investor ("Investor A") who invested $40 million based on the recommendation of its investment adviser ("Adviser A"). On December 28, 2021, four additional investors invested $9 million in the Offering. On August 22, 2022, an additional investor ("Investor B") invested $14 million in the Offering. Finally, on February 2, 2023, Investor B invested an additional $3 million in the Offering.

**B. Wander, Alfalla, and the Issuers Misled Investors About the Issuers' Financial Condition and Prospects**

52. Alfalla and Wander used the Investor Presentation to market the Offering to prospective investors. Alfalla drafted financial slides of the Investor Presentation, and Wander participated in conversations with employees of the Issuers and of Placement Agent A about financial representations that should be made to prospective investors. Wander approved the entirety of the Investor Presentation and distributed the Investor Presentation to some prospective investors. Wander also authorized Placement Agent A to distribute the Investor Presentation to prospective investors.

53. Wander and Alfalla approved inclusion of a slide in the Investor Presentation that falsely represented to investors that the Issuers were earning, and would continue to earn, substantial positive net income sufficient to pay the promised 10% dividend. The slide, entitled "Dividend Service Coverage," asserted that (1) the Issuers had earned $113 million in net income in the year 2020, (2) the Issuers were projecting $132 million in net income for the year 2021, and (3) assuming the Offering raised $250 million, the Issuers' net income, together with

anticipated savings from debt refinance, would cover the anticipated dividend obligation ($25 million) sixfold.

54. Wander also directed employees of the Issuers to generate an Excel model (the "Model"), which provided backup for the projected net income figure of $132 million for 2021. Alfalla participated in developing the Model. The Model projected that more than half of the 2021 net income ($71.8 million out of $132.3 million) would derive from the Issuers' "Consumer and Commercial" segment, that is, from SuttonPark.

55. Wander and Alfalla directed Placement Agent A to make the Model available to prospective investors, along with the Diligence Materials, via an electronic diligence data room. In addition to the Model, the Diligence Materials included, among other things, a schedule of the Issuers' credit facilities as of March 31, 2021, indicating the name of the lender and borrower, the type of facility, the amount outstanding, the type of collateral, and the maturity date. This schedule listed the Credit Facility and indicated that its maturity date was in the future, but did not disclose that the Issuers had misused the Credit Facility to purchase non-income-generating assets that could not serve as collateral for the Credit Facility, and had double-pledged Credit Facility collateral, resulting in an overdraw and impairing the Issuers' financial prospects.

56. Wander and Alfalla knew, or recklessly disregarded, that the actual and expected net income information included in the Investor Presentation and the Model were false and misleading. As of summer 2021, Wander and Alfalla knew about, or recklessly disregarded the existence of, the Credit Facility overdraw, and that the overdraw meant the Issuers had no realistic prospect of earning profits in 2021. Furthermore, Wander and Alfalla knew or recklessly disregarded that, as of summer 2021, the Issuers had no expectations of receiving sufficient income from sources other than SuttonPark to justify the income projections in the

Investor Presentation. Despite being aware of these facts, Wander and Alfalla did not disclose the overdraw of the Credit Facility to prospective investors in the Offering and concealed the Issuers' inability to achieve the projected profits.

57. Wander's and Alfalla's misrepresentations were material. For example, a representative of Adviser A believed, after reviewing the Investor Presentation and Diligence Materials, and meeting with Wander and Alfalla, that the Issuers presented a low credit risk and would generate substantial cashflow from SuttonPark, ensuring that the Issuers would be able to make the 10% dividend payment. Based on this belief, Adviser A recommended that its advisory client, Investor A, participate in the Offering. Investor A accordingly invested $40 million in the September 2021 raise.

58. After the September 2021 raise from investors, the Issuers' financial position continued to worsen, and the Issuers were not able to cure the overdraw in the Credit Facility.

59. Wander, Pasko, and Alfalla recognized that the overdraw was a significant obstacle to the Issuers' prospects. For example, on September 25, 2021, Alfalla told Wander and Pasko, via text message:

> Last week was obviously a good week for us. So thank you for your collective efforts. However, we still have a $300m+ borrowing base deficiency that needs to be addressed between now and 12/31/21. . . . Effectively, we need to cure the borrowing base by at least $100m per month if we are trying to spread it out.

60. Then, on November 15, 2021, Alfalla again texted Pasko and Wander to express his concern about the overdraw and his doubt that it could be solved via raising additional capital from investors:

> [I]t is still to [sic] vast to expect with confidence that we will be able to raise preferred equity in the amount of $300m+. I think we need to discuss alternative plans/contingency measures . . . . It is going to be a difficult for me to continue working here if at year-end the situation does not dramatically improve. . . . Today alone

> we need several millions that we don't have and this is a payroll week and liabilities are growing at an astronomical pace due to our aviation sector not providing sufficient cash to cover its obligations.

61. Despite the Issuers' growing liabilities, the Issuers continued to rely on the misleading Investor Presentation and Diligence Materials to market the Offering to additional investors, including the four investors who invested in the December 2021 raise.

62. Wander and Alfalla were agents of 777 Partners and 600 Partners, acting on behalf of 777 Partners and 600 Partners during the Offering, when they misled investors about the Issuers' prospects. Wander and Alfalla's actions are therefore imputed to 777 Partners and 600 Partners.

**C. Wander and the Issuers Misled Investors about the Issuers' Use of Proceeds**

63. Wander also made false and misleading representations to investors in the September 2021 raise about the Issuers' intended use of proceeds of the Offering by representing that the proceeds would be used for "general corporate purposes" while knowingly or recklessly omitting that he intended to use a portion of the proceeds for his and Pasko's personal benefit.

64. Specifically, the Investor Presentation that Wander approved, on a slide entitled "Terms of Offered Securities," represented that the Issuers would use the money for "general corporate purposes." The next slide, entitled "Investment Highlights," explained that the Offering proceeds would be used to "reduce inefficient funding facilities" and "support growth trajectory." The Investor Presentation did not disclose that Wander intended to use a portion of the proceeds for his and Pasko's personal benefit.

65. The Term Sheet, which was incorporated by reference into the Subscription Agreement that Wander, Pasko, and Alfalla approved as members of the Board of 777 Partners (and that Pasko and Alfalla approved as members of the Board of 600 Partners), similarly stated

that the Issuers would use the proceeds for "general corporate purposes," giving several examples of such. Though the Term Sheet indicated that there were "no restrictions" on the Issuers' use of proceeds, it did not disclose that Wander intended to use a portion of the proceeds for his and Pasko's personal benefit.

66. Wander knew or recklessly disregarded that these representations and omissions about the Issuers' intended use of proceeds from the Offering were materially false and misleading.

67. Wander did not disclose to all of the prospective investors that he intended to use a portion of proceeds to benefit himself and Pasko. Investor A, for instance, understood, based on review of the Investor Presentation, Diligence Materials, and conversations with Wander, that the proceeds of the Offering would be used to support the Issuers' growth.

68. Contrary to the representations in the Investor Presentation and Term Sheet, on September 21, 2021, the same day that the Issuers received funds from Investor A and other investors in the September 2021 raise, the Issuers transferred $24,914,722.13 to Wander and $8,028,681.54 to Pasko, at Wander's direction.

69. Wander was an agent of 777 Partners and 600 Partners, acting on behalf of 777 Partners and 600 Partners, when he misled investors about the Issuers' intended use of proceeds. Wander's actions are therefore imputed to 777 Partners and 600 Partners.

**D. Wander, Alfalla, and the Issuers Misled Investor B about the Issuers' Finances**

70. In summer 2022, Wander and Alfalla marketed the Offering to Investor B. In marketing the Offering to Investor B, Wander and Alfalla continued to use the materially false and misleading Investor Presentation and Diligence Materials that they had used to market the Offering to previous investors. In addition, Wander and Alfalla failed to disclose to Investor B losses that the Issuers suffered in the first quarter of 2022.

71. In August 2022, with Wander's and Alfalla's knowledge and approval, the Issuers sent a representative of Investor B the Investor Presentation, without any changes or updates since summer 2021.

72. However, Wander and Alfalla knowingly, or with reckless disregard, failed to disclose to Investor B large losses suffered by the Issuers in spring 2022. Beginning in March 2022, the Issuers' financial condition had worsened substantially following a series of interest rates raises imposed by the Board of Governors of the Federal Reserve System. Following the rise in interest rates, the Issuers experienced $504 million in losses in their financial assets line-item in the first quarter of 2022, contributing to a quarterly operating loss of $382 million. Wander and Alfalla were aware, or recklessly disregarded, the Issuers' worsened financial condition following these interest-rate increases.

73. Nonetheless, Investor B's Subscription Agreement included a representation that the Issuers had provided the "unaudited combined balance sheet of the Company as of December 31, 2021" to Investor B and that there had been "no material adverse change to the financial condition of the Company since the date of the most recent Financial Statements provided." This representation was false and misleading because the Issuers had suffered a quarterly loss of $382 million as of March 31, 2022, which was not disclosed to Investor B before it invested.

74. In reliance on the misleading misrepresentations in the Investor Presentation and Subscription Agreement, on August 22, 2022, Investor B signed the Subscription Agreement (which included the "no material adverse change" representation) and invested $14 million in the Offering.

75. On February 2, 2023, Investor B invested another $3 million in the Offering.

76. Wander and Alfalla were agents of 777 Partners and 600 Partners, acting on behalf of 777 Partners and 600 Partners, when they misled Investor B about the Issuers' prospects. Wander's and Alfalla's actions are therefore imputed to 777 Partners and 600 Partners.

**E. Pasko Should Have Known of the Misrepresentations in the Term Sheet, Investor Presentation and Diligence Materials**

77. As a member of the Boards of 777 Partners and 600 Partners, Pasko approved the terms of the Offering and the form of the Subscription Agreement.

78. Pasko also personally signed every investor Subscription Agreement on behalf of 777 Partners and 600 Partners.

79. Pasko thereby should have known of the representations in the Term Sheet, the Investor Presentation, and the Diligence Materials, all of which were incorporated by reference in the Subscription Agreement.

80. The Subscription Agreements signed by Pasko included Investor B's Subscription Agreement, which included the materially false and misleading representation that the Issuers had suffered no material adverse change since the most recent financial statement provided to Investor B.

81. As alleged above, including in paragraphs 43-45, Pasko knew or should have known that the overdraw of the Credit Facility had impaired the Issuers' prospects.

82. Pasko also knew or should have known that the Issuers planned to pay him a portion of the incoming investor funds.

83. Pasko therefore should have known that the representations in the Term Sheet, the Investor Presentation, and the Diligence Materials were false and misleading.

84. Pasko nevertheless failed to confirm the accuracy or completeness of the representations in the Term Sheet, the Investor Presentation, or the Diligence Materials before approving the form of Subscription Agreement, signing the investor Subscription Agreements, or accepting $8,028,681.54 out of the proceeds of the September 2021 raise.

## III. THE AFTERMATH OF THE OFFERING

85. In late 2022, Lender A learned about a possible problem in the collateral underlying the Credit Facility and began inquiring about the status of its loan.

86. Wander and Alfalla attempted to conceal the misuse and overdraw of the Credit Facility from Lender A, but Lender A ultimately commenced litigation after determining that substantial collateral was missing.

87. In February 2024, Alfalla resigned from 777 Partners and 600 Partners.

88. In May 2024, Wander and Pasko resigned from 777 Partners and 600 Partners.

89. The Issuers are presently being managed by a restructuring firm hired by one of its lenders.

90. Investors in the Offering have suffered serious financial harm from participating in the Offering.

## FIRST CAUSE OF ACTION
**Violations of Securities Act Section 17(a)**
**(Against Wander, 777 Partners, and 600 Partners)**

91. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-21, 24-42, 46-76, 85-90.

92. Defendants Wander, 777 Partners, and 600 Partners, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly,

or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

93. By reason of the foregoing, Defendants Wander, 777 Partners, and 600 Partners, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CAUSE OF ACTION**
**Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(Against Alfalla)**

94. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-20, 23-42, 46-76, 85-90.

95. Defendant Alfalla, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

96. By reason of the foregoing, Defendant Alfalla, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

**THIRD CAUSE OF ACTION**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Against Wander, Alfalla, 777 Partners, and 600 Partners)**

97. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-21, 23-42, 46-76, 85-90.

98. Defendants Wander, Alfalla, 777 Partners, and 600 Partners, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

99. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CAUSE OF ACTION**
**Violations of Securities Act Sections 17(a)(2) and 17(a)(3)**
**(Against Pasko)**

100. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1-20, 22, 24-90.

101. Defendant Pasko, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a

material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (2) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

102. By reason of the foregoing, Defendant Pasko, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(2) and 17(a)(3) [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants Wander, 777 Partners, and 600 Partners, and their agents, servants, employees, and attorneys and all persons in active concert or participation with them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Permanently enjoining Defendant Alfalla, and his agents, servants, employees, and attorneys and all persons in active concert or participation with him, from violating, directly or indirectly, Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

Permanently enjoining Defendant Pasko, and his agents, servants, employees, and attorneys and all persons in active concert or participation with him, from violating, directly or indirectly, Securities Act Sections 17(a)(2) and 17(a)(3) [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)];

**IV.**

Ordering Defendants Wander, 777 Partners, and 600 Partners, jointly and severally, to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

V.

Ordering Defendants Pasko, 777 Partners, and 600 Partners, jointly and severally, to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78(u)(d)(3), 78u(d)(5), and 78u(d)(7)];

**VI.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and/or Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**VII.**

Ordering that Defendants Wander, Pasko, and Alfalla, pursuant to Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1) and (5)] and/or Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], are permanently restrained and enjoined from directly or indirectly, including, but not limited to, through any entity they own or control, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such an injunction

shall not prevent Defendants Wander, Pasko, and Alfalla from purchasing or selling securities for their own personal accounts;

**VIII.**

Ordering that Defendants Wander and Alfalla, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], are permanently prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

**IX.**

Ordering that Defendant Pasko, pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(d)(5)], is permanently prohibited from serving as an officer or director of a public company; and

**X.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Case 1:25-cr-00487-JSR Document 1 Filed 10/07/25 Page 29 of 29

Dated: New York, New York
October 16, 2025

*<u>/s/ Ben Kuruvilla</u>*
Ben Kuruvilla
Thomas P. Smith, Jr.
Rebecca Reilly
Nicholas Flath
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street Suite 20-100
New York, NY 10004-2616
Tel. (212) 336-5599
kuruvillabe@sec.gov

*Attorneys for Plaintiff*