UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA                            :

  -v.-                                                                  :          25 Cr. 473 (JPO)

JOSHUA WANDER,                                          :

                Defendant.              :

---------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S MOTION FOR A HEARING AND FURTHER RELIEF

JAY CLAYTON
United States Attorney
Southern District of New York
Attorney for the United States of America

Marguerite B. Colson
Sarah Mortazavi
Alexandra Rothman
Assistant United States Attorneys
- Of Counsel -

TABLE OF CONTENTS

I.     Background ............................................................................................................ 3

II.    Wander's Motion ............................................................................................... 12

I.     Wander Has Not Made Out a *Prima Facie* Case that the Prosecution Team
       Leaked Information Subject to Federal Rule of Criminal Procedure 6(e)............ 13

A.     Applicable Law ................................................................................................... 13

B.     Discussion ........................................................................................................... 15

1.     Wander Has Not Established the Disclosure of Matters Before the Grand Jury... 15

2.     Wander Has Not Established that the Prosecution Team Was the Source of Any
       Improper Disclosures .......................................................................................... 19

3.     Any possible *prima facie* showing of a government source has been rebutted.... 24

II.    Wander Cannot and Does Not Attempt to Show Prejudice from the Alleged Leaks
       .............................................................................................................................. 26

A.     Applicable Law ................................................................................................... 26

B.     Discussion ........................................................................................................... 27

## TABLE OF AUTHORITIES

**CASES**                                                         **PAGE(S)**

*Bank of Nova Scotia v. United States,*
   487 U.S. 2505 (1988)..............................................................................................................27, 28

*Barry v. United States,*
   865 F.2d 13175 (D.C. Cir. 1989) ...................................................................................19

*Blalock v. United States,*
   844 F.2d 1546 (11th Cir. 1988) .....................................................................................17

*Comm. on Judiciary,U.S. House of Representatives v. McGahn,*
   332 F.R.D. 412 (D.D.C. 2019)........................................................................................19

*In re Grand Jury Investigation (Lance),*
   610 F.2d 2028 (5th Cir. 1980) .......................................................................................20

*In re Grand Jury Subpoena,*
   103 F.3d 2349 (2d Cir. 1996)..........................................................................................14

*In re Grand Jury Subpoena*,
   920 F.2d 235, 241 (4th Cir. 1990)...................................................................................18

*United States v. Adams,*
   755 F. Supp. 3d 5194 (S.D.N.Y. 2024).....................................................................passim

*United States v. Blaszczak,*
   No. 17 Cr. 357 (LAK), 2018 WL 13221923 (S.D.N.Y. Mar. 12, 2018).....................passim

*United States v. Eastern Air Lines, Inc.,*
   923 F.2d 2414 (2d Cir. 1991)..........................................................................................14

*United States v. Eisen,*
   974 F.2d 2461 (2d Cir. 1992)......................................................................................27, 28

*United States v. Haller,*
   837 F. 2d 848 (2d Cir. 1988)...........................................................................................13

*United States v. Interstate Dress Carriers, Inc.,*
   280 F.2d 524 (2d Cir. 1960).............................................................................................14

*United States v. Nordlicht,*
   No. 16 Cr. 640 (BMC), 2018 WL 61067073 (E.D.N.Y. Nov. 21, 2018).....................15, 20

*United States v. Phillips,*
   843 F.2d 4381 (8th Cir. 1988) ........................................................................................14

*United States v. Rioux,*
   97 F.3d 6482 (2d Cir. 1996)....................................................................................14, 17, 25, 30

*United States v. Skelos,*
   988 F.3d 6452 (2d Cir. 2021)................................................................................15, 20, 25

*United States v. Skelos,*
   No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015)...............14, 15, 16, 20

*United States v. Walters,*
   910 F.3d 11 (2d Cir. 2018).......................................................................................passim

The Government respectfully submits this memorandum of law to oppose the motion of defendant Joshua Wander for an evidentiary hearing based on alleged leaks by the prosecution of matters occurring before the grand jury. ("Motion" or "Mot." (Dkt. 24, 25)). As virtually every fact and inference of significance in Wander's memorandum is wrong, and as his legal arguments are flawed, this Court should deny the Motion without a hearing.

The prosecution team did not leak grand jury information and Wander supplies no credible basis to believe otherwise. Wander's claim that his commercial failures and poor public reputation trace back to reporting about the Government's investigation reverses the causal chain of events. Long before the United States Attorney's Office and law enforcement began to investigate Wander, public reporting raised red flags about his business practices, management capabilities, and criminal history. Furthermore, civil litigants had sued Wander for fraud and business misconduct. Indeed, 777's reputation was so sullied by July 2023 that soccer fans showed up to a stadium with signs and banners to protest his company's efforts to acquire an English Premier League team. The Government's investigation responded to and explored these public accusations; it did not cause them.

In the absence of any direct evidence of a leak, Wander strains the text of a handful of press reports to conclude that their authors must have had a government source. This interpretative exercise leads Wander to commit a series of blunders. Most obvious, Wander asserts that the inclusion of grand jury material in a November 2023 *Semafor* article derailed his acquisition of a soccer team and put unfair pressure on his business dealings. But at the time of that article, no grand jury subpoenas had been issued, no witnesses had testified before the grand jury, and no grand jury proceedings had occurred. The November 2023 article, therefore, could not contain any leaked grand jury material because no such material existed. To take another blunder, Wander blithely begins his memorandum by claiming that press reporting on a "joint investigation" proves

the involvement of a Government source. According to Wander, such information could only have been known by someone inside the Government. (Mot. at 1). Wrong again. The members of the prosecution team never discussed a "joint investigation" or turf war with another DOJ component over this matter. The reporting is simply wrong. Wander's motion is replete with such errors, and they signal the hollowness of his claims.

Wander also pairs his uninformed factual accusations with an erroneous view of the law. To prevail on his Motion, among other things, Wander must demonstrate that the leaks "substantially influenced the grand jury's decision to indict," *United States v. Walters*, 910 F.3d 11, 23 (2d Cir. 2018) (quotation marks and citation omitted). Rather than attempt to meet that threshold—inconceivable in light of the abundant evidence substantiating Wander's guilt—he asserts he can meet his burden later and implies that scuttled business dealings are sufficient to carry his burden. (Mot. at 23). But the law of this Circuit is otherwise. Where, as here, the theory of prejudice is predicated on legally irrelevant facts, the Motion fails.

In the end, Wander's motion airs his public relations grievances. But neither the common law nor the Federal Rules of Criminal Procedure empower a defendant to convene a hearing whenever it may suit his media strategy. To obtain a hearing, a defendant must make a *prima facie* showing that disclosed information was subject to grand jury secrecy rules and that the prosecution was responsible for improperly disclosing it. Wander has not and cannot make either showing. And even if Wander's grab-bag of press reports could make out a *prima facie* case, no hearing is required when the Government rebuts the *prima facie* case, as the appended declarations conclusively do here. For all the reasons provided herein, the Motion should be denied.

2

**RELEVANT FACTS**

### I.  Background

As early as July 3, 2023, long before any mention of a government investigation into 777, news organizations reported on 777's questionable business practices. (*See* Declaration of Michael Martinez ("Martinez Decl.") Ex. 21). On that date, *Josimar* ran a long-form article scrutinizing 777's finances and Wander's criminal history. As depicted below, the image accompanying the article depicted attendees at a soccer stadium displaying signs reading "777 NOT WELCOME" and "777 OUT."



(*Id.*)

The July 2023 *Josimar* article reported numerous negative facts concerning 777 and Wander:

- "The size of 777's spend is all the more remarkable because they haven't just bought football assets: they have also taken on their considerable liabilities, committing to spending tens, hundreds of millions more in player acquisitions, debt

servicing and infrastructure for years to come. None of their clubs is profitable, in fact, 777's football empire appears to be haemorrhaging money."

- "The face of the company is Josh Wander, a University of Florida graduate with a chequered history who has seen his name repeatedly appear in courts in the USA."

- "Wander's first brush with the law came when he was arrested for drug trafficking as a 21-year-old. . . . . He was arrested twice more in Florida, his home state, in 2009 and 2018, on other, lesser charges, and both he and many of the non-footballing companies within or related to the 777 portfolio were, over the years, named in a string of other hugely controversial and at times deeply shocking court cases across the US, some of which are ongoing."

- "Whilst working as director of acquisitions for Structured Asset Services LLC in 2009, Wander was supplied with a reference letter in support of various motions relating to the terms of his probation by Andrew Savysky, the company's president at that time. The letter was submitted to court. But Savysky then dramatically withdrew it and sued Wander instead, alleging he 'misappropriated confidential company information and trade secrets, and otherwise violated the terms of his employment agreement.' . . . . [And] in July 2009, Wander was arrested again for failing to appear in court."

- "On 14 October 2011 [Wander] landed himself in hot water with the Bellagio, a famous Las Vegas resort and casino . . . . The Bellagio advanced him 78,000 dollars in credit, but was forced to take him to court when he left the resort having paid back just 5,000 dollars. In November of the following year, having paid off some of the debt, a Nevada court ordered him to settle the rest, plus costs, putting his outstanding liability at 54,500 dollars. But by 6 November 2018, Wander still had not paid back all of the money . . . . Wander still owed Bellagio 17,853 dollars at the time an affidavit of renewal was brought before the court."

- "Wander was summoned to court in Florida once again in January 2013, accused by American Express Centurion Bank in Utah of failing to pay a credit card bill. The company closed his account claiming he owed them 245,516 dollars as of April 2013. By August, he was ordered by the court to pay back the full amount, plus costs. By November he had repaid the debt in full."

- Wander's "name then appeared in a 2019 lawsuit in Virginia alleging 777 had entered into an illegal loans business with Rosebud Lending, a predatory lender[.]'"

- "Looking for new investment opportunities in other markets, 777 began to branch out into the aviation industry, acquiring a 25 percent stake in Flair Airlines, a Canadian budget airline, in 2019. But while Flair grew rapidly, it had four Boeing 737 MAX passenger jets repossessed on 11 March 2023, for which the airline blamed a 'conspiracy' and filed a 50 million dollar lawsuit. The jets had been leased

4

> to Flair but, according to the lessor, Irish company Airborne Capital, the monthly repayments which should have been made by 777 had failed to materialize."

- "Joshua Wander and his company . . . also own a controlling interest in the London Lions, a BBL team . . . one source, speaking on condition of anonymity, has told Josimar that 777's continued funding of the BBL is in doubt."

(*Id.*) That article made no mention of a pending criminal investigation into 777. Subsequent to the initial publication of the article, it was amended to include a statement from 777 Partners' general counsel: "Joshua has always been honest with his mistakes, which he made more than 20 years ago and which has no direct bearing on his business operations nor the reporting of these. Joshua remains an upstanding member of 777s leadership team and the community at large." (*Id.*).

The negative reporting on 777 continued through the fall of 2023. On October 7, 2023, *The Daily Mail* published an article regarding 777's bid to buy a controlling stake in Everton Football Club ("Everton"), and further questioned 777's financial health. (Roos Decl. Ex. A). The article stated that "the erratic nature of the company's business practices is causing concern in the sport"; that "significant uncertainty has been raised over the source of 777's funding for the £500 million deal to take over Everton, while the company are also involved in fighting several court cases in the United States"; and that Vasco de Gama, another soccer club in which 777 had a stake, had "missed scheduled transfer payments." (*Id.*). The article did not reference any criminal investigation.

On October 10, 2023, *The New York Times* reported on 777's bid to acquire Everton, "one of the oldest soccer clubs in England," stating that although 777 claimed to have "$10 billion in assets," "[l]awsuits against the firm raised concerns for potential partners" and "[a] string of unpaid bills, some as recent as this month, raised more." (Roos Decl. Ex. 16). Notably, the article recognized that in bidding for Everton, "777 Partners faces something it had previously avoided: a forensic review of its holdings, its finances and its brash American co-owner, Josh Wander[.]"

(*Id.*) Characterizing the bid as "by no means a sure thing," the article further stated that 777's bid for Everton would be scrutinized by England's Football Association and a British government regulator before it could be approved. (*Id.*). The article cited a number of sources who "revealed new details and questions about the sources of [777's] financing," such as "[m]ore than a dozen current or former employees, club officials and others who have done business with 777"—but notably, not law enforcement agents. (*Id.*). Those sources "shared details about unmet obligations and unpaid bills, and wondered if the company has the resources to manage a global network of clubs carrying hundreds of millions of dollars in debts and obligations." (*Id.*). Citing "outsiders," *The New York Times* reported that "the repeated issues involving money suggested an exercise in financial plate-spinning rather than the kind of healthy, well-capitalized owner a Premier League team requires." (*Id.*). Some of the specific details listed in the article included "missed payments related to agreed-upon funding schedules and routine operating expenses" for several of the businesses run by 777, including the British Basketball League, Standard Liège, and Vasco de Gama. The article likewise detailed "a former business partner['s] . . . allegation of fraud against the company," including accusing 777 and its subsidiary in a court filing of operating "a web of companies 777 uses to move around money and assets to operate and conceal a sprawling fraudulent enterprise.'" (*Id.*).

A second *Times* article, published on October 18, 2023, repeated the thrust of the prior article, focusing on 777's unwillingness to expose its finances. The article stated: "The proposed sale of the Premier League soccer team Everton F.C. to a Miami-based holding company has stalled because the firm, 777 Partners, has failed to provide audited financial statements to a British government regulator that must approve the deal." (Roos Decl. Ex. C). The article further reported that 777's bid for Everton could be scuttled by 777's reluctance to share requested financials with regulators. Citing "multiple people with direct knowledge of the approval process," the *Times*

article stated that according to these sources, "If the company does not provide the requested financials or an acceptable explanation, its proposed takeover of Everton — a deal involving hundreds of millions of dollars in assumed debt and a coveted place in the world's richest soccer league — could fall apart," further emphasizing that "[t]he missing documents are the most significant complication to date in the effort by 777 Partners" to acquire Everton. (*Id.*). The original timeline for the deal, which was to "complete [777's] takeover by the end of the year . . . now seems questionable." (*Id.*).

Again citing "multiple people familiar with the process and a review of documents related to it," the article reported that the regulatory and governing bodies responsible for approving the deal "are unsatisfied with the financial statements that have been provided," including "the failure of 7777 Partners to provide up-to-date audited financial records" for the holding company. (*Id.*). "[C]urrent and former employees have questioned [777 Partners'] viability" as the company "continues to miss routine payments to businesses, vendors and partners, including brokers that acted on some of the soccer deals, four people familiar with 777's operations said, . . . [and] has missed payroll on at least two occasions" and failed to pay "bonus payments, a major component of some executives' compensation." (*Id.*).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

───────────────────

[1] ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

On or about November 22, 2023, a representative of *Semafor* reached out to the U.S. Attorney's Office for the Southern District of New York ("SDNY's") chief of public affairs regarding a story the publication was working on concerning 777. (Roos Decl. ¶ 6).

On November 26, 2023, *Forbes* published an article that questioned the viability of 777's bid for Everton, stating that 777 "is still trying to raise the money to close the deal," and that "[s]ources told [the reporter] . . . that they heard the money [to acquire Everton] was coming from Colombia drug money." (Roos Decl. Ex. D).

A representative for *Semafor* followed up on its initial email to SDNY on November 27, 2023 and wrote, in substance, that they believed AUSA Roos was working on the matter. (Roos Decl. ¶ 6). Neither inquiry was prompted by SDNY, and at that point, AUSA Roos was not working on the matter, as there was no open investigation into 777. (*Id.*). On November 28, 2023, SDNY administratively opened a criminal investigation into 777. (Roos Decl. ¶ 7). ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████

Also on November 30, 2023, *Sports Pro* reported on the "roadblocks" to 777's acquisition of Everton. (Roos Decl. Ex. E). The article further stated that 777 was "scrounging for cash" to purchase Everton "having been unsuccessful in trying to bring wealthy businessmen . . . into the investment." (*Id.*).

---

████████████████████████████████████████████████

On November 29, 2023, Liz Hoffman of *Semafor* emailed a 777 representative seeking comment on her impending article, and in particular, the existence of an investigation into 777. (Martinez Decl. Ex. 7). In the email exchange, Hoffman did not refer to a law enforcement source, referring instead to "unnamed sources." (*Id.*).

On November 30, 2023, *Semafor* published an article reporting, among other things, that there was a Department of Justice Investigation into 777 Partners, that AUSA Roos was leading the team investigating Wander, and further stated: "The DOJ probe is in its early stages and may not lead to further actions." (Martinez Decl. Ex. 8). The article sourced its claims to "people familiar with the matter" and noted that the "SDNY declined to comment[.]" (*Id.*). It did not cite a law enforcement source.

Following that publication, three additional articles published on December 1, 6, and 7, 2023, respectively, repeated *Semafor*'s reporting, adding no new details. (*See* Martinez Decl. Exs. 13, 14, 16).  Consistent with the *Semafor* article, none of these articles named a law enforcement source, nor did any mention the grand jury.

A fourth follow-on article, published on December 6, 2023, also made no mention of the grand jury or a source within law enforcement: "The U.S. Attorney's Office in Manhattan has started probing 777 Partners, its investments in sporting teams and whether the firm ran afoul of US money laundering laws, according to a person familiar with the inquiries. The investigation . . . is at an early stage and may not lead to criminal charges." (Martinez Decl. Ex. 15).

Following the publication of that article, AUSA Roos was contacted by outside counsel for 777 Partners.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ There were no

9

discussions at that point or thereafter with Florida-based criminal prosecutors regarding 777. (*Id.*).

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████

On March 12, 2024, *Semafor* published another article. (Martinez Decl. Ex. 19). That article was preceded by one interview that occurred outside the presence of the grand jury ███ ███████████████████████████████████ (Roos Decl. ¶¶ 9, 10). That article, once again, did not mention a law enforcement source or a grand jury investigation. It stated, in part: "The U.S. Justice Department has been investigating whether 777 broke money-laundering laws, Semafor reported in November. Prosecutors have interviewed current and former 777 employees, and state insurance regulators in Utah and elsewhere are also investigating the company's insurance operations, people familiar with the matter said." (*Id.*).

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████

Beginning in or around June 2024, AUSA Roos learned that the defendant was publicly discussing the investigation with others, including in connection with a witness that was being interviewed by SDNY, and with another SDNY prosecutor at a social event. (Roos Decl. ¶ 12).

The last article on which Wander relies is a November 18, 2024 *Josimar* article. (Martinez Decl. Ex. 20).[2] That article post-dated the enhanced scrutiny Wander claims to have

---

[2] ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

faced after *Semafor*'s initial article the prior year, (Mot. at 9-11), the conclusive collapse of 777's bid for a controlling stake in Everton, (Mot. at 11), and the civil lawsuit filed by Leadenhall accusing 777 of fraud, (Mot. at 11-12). The article also post-dated the point at which the Government's "investigation was overt and well-known to the defendant, 777's officers and employees, witnesses, and other third parties." (Roos Decl. ¶ 13). Before the article's publication, ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ (*Id.*).

     Among other things, the November 2024 *Josimar* article stated the following:

> Criminal subpoenas have been sent to employees of both 777 Partners and A-CAP as part of a money laundering investigation by the US Department of Justice. The probe, which began months ago, is a joint investigation by the Securities and Exchange Commission (SEC), FBI and Homeland Security, and is being led by the Southern District of New York assistant attorney Nicolas Roos – who was one of the lead prosecutors of crypto fraudster Sam Bankman-Fried . . . . Multiple sources with knowledge of the matter have told Josimar that subpoenas have now been issued summoning multiple parties to court to give evidence, and it is understood that investigators are examining whether money from policyholders of A-CAP's insurance companies has been invested properly. When questioned about the investigation and the subpoenas, a person familiar with the matter told Josimar that any regulatory authority would be asking questions about what happened at 777 Partners, and that when approached, A-CAP has been highly collaborative with enquiries. The same source stressed that A-CAP has not received any communication that they are the *target* of any investigation. . . . Everton fans will hope that the news of criminal subpoenas being issued does not spook an investor who walked away once already citing issues with this loan.

(Martinez Decl. Ex. 20).

---

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

## II. Wander's Motion

In a memorandum of law dated April 7, 2026, Wander seeks an order from this Court scheduling an evidentiary hearing on whether there were any unauthorized leaks of Rule 6(e) information in connection with this matter. Wander does not cite a single article referring to an existing investigation that claims a law enforcement official as a source. Nor does he cite any article that reports on information that could only have been derived from a member of the prosecution team or that otherwise describes Rule 6(e) material. The articles Wander cites dating from November 30, 2023 through March 12, 2024 mention the existence of an investigation and select details related to that investigation, but nowhere do they reference the details of a *grand jury* investigation. (*See* Martinez Decl. Exs. 8, 13-16, 19). The seventh article cited by Wander, and the only one that mentions the issuance of subpoenas, does not mention any testimony before the grand jury or documents presented to the grand jury. (Martinez Decl. Ex. 20). Notably, the article was published on November 18, 2024, long after the events Wander claims caused him prejudice, (Martinez Decl. Ex. 20; Mot. at 9-12, 24), and likewise after the Government's investigation had gone "overt" to "dozens of" individuals. (Roos Decl. ¶ 13).

Wander's motion amplifies glancing references to investigations in a handful of press articles, while eliding the torrent of negative coverage regarding the opacity and precarity of 777's finances. Contrary to Wander's *post hoc* rationalization that the news reports of a government investigation caused a parade of horribles, as detailed in the factual recitation above, 777 was already the subject of widespread reporting questioning its finances, business model, continued viability, reluctance to share audited financials, and ability to afford a takeover of Everton.

12

## ARGUMENT

### I. Wander Has Not Made Out a *Prima Facie* Case that the Prosecution Team Leaked Information Subject to Federal Rule of Criminal Procedure 6(e)

Wander has not established either the disclosure of information that is subject to the secrecy protections of Federal Rule of Criminal Procedure 6(e) or that any such disclosure came from a member of the prosecution team. As a result, his Motion fails at the threshold.

### A. Applicable Law

The "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," because absent that secrecy, "prospective witnesses may be deterred from testifying, those who do testify may be less likely to do so truthfully, targets of investigations may flee, and persons who are the subject of an ultimately meritless investigation may face public embarrassment." *United States v. Haller*, 837 F. 2d 84, 87-88 (2d Cir. 1988). Grand jury secrecy is codified in Federal Rule of Criminal Procedure 6(e)(2).

The "core" of what Rule 6(e)(2) protects is "evidence that is actually presented to the grand jury," but "[p]rotection also extends beyond the literal evidence that is presented to include 'anything that may tend to reveal what transpired before [the grand jury], such as summaries of grand jury testimony.'" *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *9 (S.D.N.Y. Oct. 20, 2015) (quoting *United States v. Eastern Air Lines, Inc.*, 923 F.2d 241, 244 (2d Cir. 1991)). "[T]he Rule is intended only to protect against disclosure of what is said or what takes place in the grand jury room." *United States v. Interstate Dress Carriers, Inc.*, 280 F.2d 52, 54 (2d Cir. 1960). Thus, for example, even where documents are produced pursuant to a grand jury subpoena, if they are never actually shown to the grand jury, then they are "not 'matters occurring before a grand jury' and are not subject to the secrecy provisions of rule 6(e)." *United States v. Phillips*, 843 F.2d 438, 441 (8th Cir. 1988); *see also*

13

*In re Grand Jury Subpoena*, 103 F.3d 234, 238-39 (2d Cir. 1996) (quoting *Phillips*).

The Rule also "does not apply to disclosures of information obtained independently of the grand jury process, even if the same information might later be presented to the grand jury." *Skelos*, 2015 WL 6159326, at *10. When the Government gathers information outside of the grand jury, "through wiretaps, search warrants, and interviews with witnesses not expected to appear before the grand jury," that information "is not subject to Rule 6(e) provisions on disclosure." *Id.*; *see also Eastern Air Lines*, 923 F.2d at 244 (Rule 6(e) not violated by disclosure of search warrant affidavit, even if information from affidavit might later be presented to the grand jury).

Where a defendant claims that grand jury matters were disclosed in violation of Rule 6(e), he must first "establish a *prima facie* case of the violation." *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996). To determine whether the defendant has made out a *prima facie* case:

> [T]he court should examine, among other factors: (1) whether the media reports disclose matters occurring before the grand jury; (2) whether the media report discloses the source as one prohibited under Rule 6(e); and (3) evidence presented by the government to rebut allegations of a violation of Rule 6(e).

*Id.*; *see also, e.g.*, *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021) (same); *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), 2018 WL 1322192, at *3 (S.D.N.Y. Mar. 12, 2018) (same). In the second prong, the sources "prohibited" under the rule include, as relevant here, an "attorney for the government," and law enforcement agents to whom disclosures are made under Fed. R. Crim. P. 6(e)(3)(A)(ii). *E.g.*, *Walters*, 910 F.3d at 19 & n.4; *see also Skelos*, 988 F.3d at 662 (distinguishing between "a 'government source' or 'law-enforcement sources'" cited in articles and "government investigators" subject to Rule 6(e)). Where the "sole . . . direct evidence" of a Rule 6(e) violation is media reporting, courts evaluate whether the

14

reporting itself contains protected grand jury information, because "if the article contains no information of the sort Rule 6(e) protects, then no *prima facie* case can be made out." *Blaszczak*, 2018 WL 1322192, at *3 n.30; *accord United States v. Nordlicht*, No. 16 Cr. 640 (BMC), 2018 WL 6106707, at *3 (E.D.N.Y. Nov. 21, 2018).

"[C]ourts have generally required a somewhat specific showing where a defendant relies on news articles to substantiate allegations of a violation." *United States v. Adams*, 755 F. Supp. 3d 519, 524 (S.D.N.Y. 2024). "[E]ven where an article indicates a 'likely' disclosure by a government official, a court may still find that the defendant has failed to make a prima facie showing if the government submits a statement indicating that no attorneys or investigators staffed on the case have disclosed information they learned in the course of the investigation to the press." *Id.* (citation omitted).

### B. Discussion

For the reasons described herein, Wander has not met his burden of "mak[ing] a *prima facie* showing that (1) there has been disclosure of a matter or matters occurring before the grand jury; and (2) that the source of the disclosure was an attorney or agent of the government." *Skelos*, 2015 WL 6159326, at *9.

### 1. Wander Has Not Established the Disclosure of Matters Before the Grand Jury

A foundational problem for Wander is that he cannot point to the disclosure of any matters occurring before the grand jury. None of the articles name grand jurors, describe testimony or presentations to the grand jury, recite evidence reviewed by the grand jury, or report an anticipated date on which an indictment would be considered. *Cf. Skelos*, 2015 WL 6159326, at *10 (collecting examples of grand jury matters); *Adams*, 755 F. Supp. 3d at 527 (same). The articles released in November and December 2023 make no mention of the grand

15

jury at all. Nor does the March 2024 *Semafor* article. While it references witness interviews, it does not suggest that those occurred before the grand jury, and they did not. (Martinez Decl. Exs. 8, 13, 14, 15, 16; and Ex. 19 ("Prosecutors have interviewed current and former 777 employers . . . people familiar with the matter said.")). As a result, none of those articles can form the basis of a meritorious Rule 6(e) motion. *Skelos*, 2015 WL 6159326, at *11.

Wander compounds his problem by describing as grand jury information various reporting that was, in fact, erroneous. For example, Wander emphasizes the November 2023 *Semafor* article as an initial and consequential leak of grand jury information. (Mot. 4, 18-19). But no grand jury investigation had occurred as of the publication of that article—no subpoenas, no testimony, no presentation, no deliberations, no charges. (Roos Decl. ¶ 8). Because this report "pre-dated the presentation of evidence to the grand jury," it cannot be that the article "disclosed a matter occurring before the grand jury." *Blaszczak*, 2018 WL 1322192, at *3 (quotation marks omitted). Similarly, ███████████████ ███████████████████████████████ ██████████████████████████ So, too, was the claim by *Semafor* that prosecutors had interviewed "current and former 777 employees." (Roos Decl. ¶ 10.b.). Things that did not occur are, of course, not "matters occurring before the grand jury." *Blaszczak*, 2018 WL 1322192, at *3-*5.

Wander attempts to obscure the absence of grand jury information from the articles he cites by suggesting that any public reference to a government investigation is tantamount to disclosure of grand jury secrets. But that legal proposition is wrong. Courts in this Circuit have long recognized that law enforcement can and does investigate crimes in parallel to a grand jury investigation and those parallel investigative steps outside the grand jury occur beyond the reach of Rule 6(e). *See, e.g., Adams*, 755 F. Supp. 3d at 526 (finding no *prima facie* showing

of a Rule 6(e) violation predicated on articles that "do not clearly indicate that they pertain to the *grand jury's* investigation" and refer only "to a parallel or separate government investigation," as contrasted by those that "identify . . . *grand jury investigations* or investigations into matters before the *grand jury* specifically." (emphasis in original)). Wander argues that interviews "which are later intended to be presented to the grand jury are paradigmatic grand jury material," (Mot. at 18), but he fails to cite any indication that such interviews occurred here, or that they were the subject of reporting. (*See, e.g.*, Roos Decl. ¶¶ 10, 10.b., 13). As a general matter, voluntary interviews are not subject to Rule 6(e). *See, e.g.*, *Rioux*, 97 F.3d at 662 (denying similar motion where "[m]ost of the media surrounding the Rioux investigation…discussed federal investigations without actually discussing matters before the grand jury"); *Blalock v. United States*, 844 F.2d 1546, 1551 (11th Cir. 1988) (no violation of Rule 6(e) based on alleged disclosure of interviews that occurred outside of the grand jury). Accordingly, reporting on investigative steps by the government without more does not reflect the disclosure of grand jury information.

Wander's attempt to shoehorn any "fact" reported about the investigation into Rule 6(e) leads to absurd claims. For example, Wander argues the identity of the assigned AUSA, "the discussion of a joint investigation with law enforcement in Miami," and the law enforcement agencies involved in the investigation are all protected by grand jury secrecy. (Mot. at 18-19). None of those facts reveals "some secret aspect of the inner workings of the grand jury," however, and thus cannot form the basis for a Rule 6(e) violation. *See In re Grand Jury Subpoena*, 920 F.2d 235, 241 (4th Cir. 1990) (quotation marks omitted). Wander's extended discussion of various references to the "lead prosecutor," the prosecutor's prior cases, and the prosecutor's supposed links to *Semafor* may make Wander's motion more colorful, *see, e.g.,* Mot. at 5, 19, 20-21, but are legally immaterial: those facts are not illustrative of grand jury

leaks.

The closest Wander can come to identifying a grand jury matter mentioned in any article is the November 18, 2024 *Josimar* article's statement that "Criminal subpoenas have been sent to employees of both 777 Partners and A-CAP as part of a money laundering investigation by the U.S. Department of Justice" and that "subpoenas have now been issued summoning multiple parties to court to give evidence[.]" (Martinez Decl. Ex. 20). But even this information—which did not come from the prosecution team, as discussed herein—does not disclose any matter occurring before the grand jury, such as the identities of any specific witnesses, and does not actually say any of the witnesses were subpoenaed to testify before a grand jury. Wander primarily relies on out-of-Circuit authority to conclude that disclosing "recipients of grand jury subpoenas" violates Rule 6(e) "because those recipients are likely to testify before the grand jury." (Mot. at 15). But Wander omits to state that the application of Rule 6(e) to subpoena recipients that never appear before the grand jury "is unclear at best" in the Second Circuit. *Adams*, 755 F. Supp. 3d at 529. In any event, the cases cited by Wander focus on the identities of people who had been subpoenaed. In *Comm. on Judiciary, U.S. House of Representatives*, for example, the U.S. District Court for the District of Columbia concluded that the actual names of subpoenaed witnesses were not disclosable. 332 F.R.D. 412, 416 (D.D.C. 2019). Similarly in the *Adams* case, the disclosures pertained to the names of people subpoenaed. *Adams*, 755 F. Supp. 3d at 529 n.7. Unlike in either of those cases, Wander cannot point to any article that contains the name of a subpoena recipient.

Consequently, Wander has failed to demonstrate that disclosure of matters before the grand jury, so his Motion fails from the start.

18

### 2.  Wander Has Not Established that the Prosecution Team Was the Source of Any Improper Disclosures

Wander also fails to make out his second showing, that the prosecution team was the source of any leaks. None of those articles say so, none of the articles quotes a member of the prosecution team, none alludes to a member of the prosecution team as a source, and, indeed, none of the articles even refer to law enforcement generally as a source. The articles generically describe their sources as persons with knowledge: "people familiar with the matter," (Martinez Decl. Ex. 8 (*Semafor* article, November 30, 2023)); "a person familiar with the inquiries," (*id.* Ex. 15 (Bloomberg article, December 6, 2023)); "people familiar with the matter," (Martinez Decl. Ex. 19 (*Semafor* article, March 12, 2024)); "Multiple sources with knowledge of the matter" and "a person familiar with the matter," (*id.* Ex. 20 (*Josimar* article, November 18, 2024)).

These facts fall well short of a *prima facie* showing that a member of the prosecution team was the source of the reporting. Indeed, the paradigmatic *prima facie* case involves express sourcing to law enforcement officials who claim grand jury knowledge, which does not exist here. *See, e.g.*, *Barry v. United States*, 865 F.2d 1317, 1325 (D.C. Cir. 1989) (multiple articles sourced to law enforcement officials with knowledge of particular testimony given to a grand jury). Even when reporters *expressly* cite law enforcement or government sources, but not prosecution team sources or sources with grand jury knowledge, the Second Circuit has refused to automatically infer that those sources were members of the prosecution team. *See Skelos*, 988 F.3d at 662 ("[T]he media outlets only identified a 'government source' or '[l]aw-enforcement sources,' not government investigators.").

Courts have also confronted and rejected the inference that Wander urges the Court to draw here, that generic sourcing to "a person familiar with" the matter is enough to discern the

19

existence of a prosecution team source. In *Blaszczak*, for example, the district court observed that "[N]either the article's attribution of sources—unspecified 'people familiar with the probe'—nor its substance sufficiently points to the government." 2018 WL 1322192, at *6. The district court in *Nordlicht* similarly concluded that such descriptions "do not warrant the conclusion that the sources in the Cited articles were government agents or government attorneys." 2018 WL 6106707, at *4. In particular, the November 2023 *Semafor* article expressly reflects that the U.S. Attorney's Office declined to comment, (Martinez Decl. Ex. 8 ("SDNY declined to comment"), further dispelling any possible inference of a leak. *See Skelos*, 2015 WL 6159326, at *11 ("[N]one of the news articles or the letter indicates that a government attorney or agent was the source of the information, and at least one explicitly states that the U.S. Attorney's Office and FBI representatives declined to comment.").

Wander is also wrong to assert that the details in the few articles he cites "reasonably could have only come from someone in government." (Mot. at 7). To be sure, "[i]t is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection." *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980). But here the information—the existence of an investigation, the identity of the prosecutor and investigating agencies, the fact of interviews, or even the issuance of grand jury subpoenas—was not uniquely within law enforcement's ken.

As discussed above, the only arguable grand jury information reflected in any of the articles is the reference to "criminal subpoenas" in the November 18, 2024 *Josimar* piece. (Mot. at 18). But the issuance of subpoenas is a step that, by its very nature, involves persons and entities outside of the prosecution team. ██████████████████████ ██████████████████████████████ (Roos Decl. ¶ 13). Up to the

publication of the November 18, 2024 *Josimar* article, the wide net of individuals privy to the existence of an investigation by the U.S. Attorney's Office would have included ███████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ their counsel, and anyone else these employees chose to inform, any or many of which could have commented to the press.

Though the other articles that preoccupy Wander do not contain any plausible grand jury information, they also do not reflect a prosecution team source. Beginning with the November 30, 2023 *Semafor* piece, the information discussed in the various articles was not known only, or even principally, by the prosecution team. ██████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████ Further undermining Wander's baseless theory is that when *Semafor* reached out to the U.S. Attorney's Office on November 22, 2023 seeking to confirm that AUSA Roos was working on the matter, no investigation had yet begun. (Roos Decl. ¶ 6).

None of the other articles contain information that necessarily came from the prosecution team. Many articles cited by Wander merely repeat the reporting of the November 2023 *Semafor* piece, adding no new information. (Martinez Decl. Exs. 13, 14, 16). And by the time of the March 12, 2024 *Semafor* article, ██████████████████████████████ ███████████████████████████████████████████████████████████████████

21

███████████████████████████ Any lawyers or witnesses aware of the Government's investigative steps could have described them. And, as it happens, the Government is aware that Wander himself was both aware of and publicly commenting on the investigation. On or about July 6, 2024, for example, at a social event, Wander approached a prosecutor with the U.S. Attorney's Office, who was not a member of the prosecution team, and stated that he had been subpoenaed. (Roos Decl. ¶ 12). Anyone who had overheard that conversation, or who had separately been privy to a spontaneous self-disclosure by Wander, could easily have leaked that information to the media. Moreover, by the time the November 2024 *Josimar* article had been published, the investigation was overt and known to "dozens of individuals" outside the prosecution team. (Roos Decl. ¶ 13).

Wander's other attempts to attribute information to the prosecution team range from frivolous to false. For example, Wander argues the identification in the November 18, 2024 *Josimar* article "of the specific combination of agencies involved is particularly indicative of a law enforcement leak" because "[e]ven an astute party outside of government would not have known the identities of the law enforcement agencies tasked with the investigation." (Mot. at 8 (citing Martinez Decl. Ex. 20)). This claim ignores that voluntary interviews typically begin with introductions by the participants. A witness or lawyer need not be particularly "astute" to learn the agencies involved in such an interview; he or she need only to listen. Nor, though he tries, may Wander infer that a particular prosecutor leaked to *Semafor* merely because that publication reported on prior cases involving the prosecutor.[3] (Mot. at 1, 6-7). The association is meaningless. The SDNY, which

---

[3] Wander pays particular attention to the fact that *Semafor* covered the trial of Sam Bankman-Fried, which featured the same prosecutor as reportedly involved in the 777 investigation. As Wander's Motion acknowledges, the trial of Bankman-Fried was subject to "extraordinary media attention" from dozens of news outlets. (Mot. at 1). The fact that any particular publication following the Sam Bankman-Fried trial would then report on another financial fraud investigation is of no moment, and hardly a basis to infer a Rule 6(e) violation.

Wander himself describes as "one of the most active U.S. Attorney's Offices in the country," (Mot. at 21), will naturally charge cases that result in press coverage, including from outlets that repeatedly report on cases brought by the Office.

Unable to point to any credible connection between the prosecution team and the press reports that trouble him, Wander offers a theory of motive in its place: the prosecution team could have wanted to "send a powerful message to potential witnesses about the seriousness and reach of the investigation" and could have aimed to "dissuade and deter other agencies that might have been interested in opening a competing investigation." (Mot. at 21). These theories are fanciful. As a general matter, the Department of Justice has no difficulty in conveying "the seriousness" of an investigation directly by saying as much to a witness, serving a subpoena on the witness, or by sending law enforcement agents to approach a witness. And the suggestion that press reporting about the investigation would dissuade other agencies from investigating is sheer conjecture. Though Wander repeatedly assumes that a "turf battle" occurred here, it did not. (Roos Decl. ¶ 8.c.).

In any event, Wander's wild motive theories cannot explain why anyone on the prosecution team would leak incorrect information. Here, virtually all the articles Wander cites contain errors that anyone participating in the investigation would *not* have made. For instance, as discussed above, the November 30, 2023 *Semafor* article misreported that there were discussions between prosecutors in the Southern District of New York and Florida regarding conducting a joint investigation; discussions which had not in fact occurred. (*Id.*).

23

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ A grand jury subpoena

issued in February 2024 did *not* list money laundering as one of the statutes under investigation,

as Wander concedes. (Martinez Decl. Ex. 10). █████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ And, as still another example, Wander points to

*Semafor*'s reporting in March 2024 that current and former 777 employees had been

interviewed, (Mot. at 19), but no such interviews had occurred at the time of those reports.

(Roos Decl. ¶ 10.b.). While it was possible a government source leaked inaccurate information,

"the far simpler and overwhelmingly more likely conclusion is that the source of the [incorrect]

assertion…was not a government agent but, instead…some person 'familiar' with incomplete

information [who] speculated incorrectly to a reporter." *Blaszczak*, 2018 WL 1322192, at *5.

### 3. Any possible *prima facie* showing of a government source has been rebutted.

The final element of a *prima facie* case is that the defendant's showing must not be

rebutted by the information from the Government. *Rioux*, 97 F.3d at 662. On this point, too,

Wander's motion fails.

No member of the prosecution team leaked grand jury information about the

investigation to the press. (Roos Decl. ¶¶ 1, 14). As detailed in the appended declarations, each

of the prosecutors and agents assigned to the investigation has confirmed that he or she did not

disclose grand jury material to the press or otherwise leak unauthorized information about the

investigation. (*Id.*).

24

Wander's thin and self-serving claim that "a government denial of a leak allegation, standing alone, is not a sufficient basis to deny a defendant an evidentiary hearing" is legally erroneous. (Mot. at 23). For one thing, it is Wander's burden to show that a leak of grand jury information occurred and that it could be sourced to the prosecution team. *Rioux*, 97 F.3d at 662. He has failed in that task. For another, the Government's appended declarations mirror those filed in *Skelos* and *Adams*, which were sufficient to dispel any *prima facie* showing. *See United States v. Adams*, No. 24 Cr. 556 (DEH), 755 F. Supp. 3d 519, 523 (S.D.N.Y. 2024); *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 289712, at *8 (S.D.N.Y. June 8, 2018) (denying hearing and finding no *prima facie* case where Government's declaration "affirm[ed] that all of the AUSAs, investigators, and FBI agents involved in this investigation did not speak to the press"), *aff'd* 988 F.3d at 662 (affirming denial of hearing, where the Government's declaration affirmed "that none of the Assistant United States Attorneys, investigators, and FBI agents involved in this investigation spoke to the press").

Wander's reliance on *United States v. Walters* only further underscores the Motion's deficiencies. Wander cites *Walters* in his Motion as "instructive" because the district court ordered a hearing into possible Rule 6(e) violations based on news reports of the Government's investigation. (*See* Mot. at 22 (citing *Walters*, 910 F.3d at 11)). But *Walters* is easily distinguishable for two reasons. First, the initial declaration submitted in support of the Government's motion made representations as to only the lead AUSA and the lead case agent on the matter; it did not purport to cover other members of the prosecution team. *See United States v. Walters*, No. 16 Cr. 338 (PKC) (S.D.N.Y. Oct. 21, 2016) (Dkt. 44 (Declaration of Telemachus P. Kasulis)). In the absence of denials by other members of the prosecution team, Judge Castel ordered a hearing to address any media leaks by any "Special Agent of the FBI

25

or Assistant United States Attorney who had participated or was participating in the investigation of the subject matter that led to the indictment[.]" *Id.* (Dkt. 46). Second, a hearing was never actually held in *Walters* because the Government's internal fact-gathering found that an FBI supervisor had been making authorized statements to the press. Here, as reflected in the attached declarations, the results are the opposite.

Though Wander has not made out a *prima facie* showing on any element, the Government's specific and factual denials suffice to demonstrate that any inference that could be drawn in Wander's favor has been rebutted.

\* \* \*

Wander has not identified any matter occurring before the grand jury described in any of the articles he identifies. Wander can supply nothing but conjecture to link those articles to a source on the prosecution team. And the prosecution team denies that it leaked grand jury information to the press. Under these circumstances, Wander's motion should be summarily denied.

## II.    Wander Cannot and Does Not Attempt to Show Prejudice from the Alleged Leaks

The Motion may also be denied because Wander cannot, and does not, try to articulate a legally cognizable theory of prejudice. Wander simultaneously blames reporting about the Government's investigation for the unraveling of his fraud and disclaims any need or effort to show prejudice in advance of a hearing. Neither his factual claims nor his legal one have any merit.

### A.    Applicable Law

"[A] defendant seeking…a hearing regarding alleged grand jury abuse must show prejudice or bias." *United States v. Eisen*, 974 F.2d 246, 261 (2d Cir. 1992). Thus, the required *prima facie* showing is the beginning, not the end, of a leak inquiry, because "even if there has

26

been a Rule 6(e) violation, relief may be granted only if the defendant shows prejudice as a result of the violation." *Blaszczak*, 2018 WL 1322192, at *3. The requirement of prejudice follows from Federal Rule of Criminal Procedure 52(a)'s harmless-error rule: the Court's supervisory power can only be invoked to correct errors that affect substantial rights. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-55 (1988). In the context of an alleged violation of Rule 6(e), the prejudice inquiry is a narrow one, focused on whether the disclosure of grand jury materials "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Walters*, 910 F.3d at 23 (citing *Bank of Nova Scotia*, 487 U.S. at 254-55).

### B.   Discussion

Wander attempts to have it both ways on the issue of prejudice. Wander devotes much of his memorandum to the claim that "[t]he consequences" of Government leaks "were severe," (*see, e.g.*, Mot. at 1), before declaring that he need not allege any prejudice before obtaining a hearing, (Mot. at 23-24).

As a matter of law, Wander may not obtain relief without a showing of prejudice. The Second Circuit has stated that "a defendant seeking . . . a hearing regarding alleged grand jury abuse must show prejudice or bias." *Eisen*, 974 F.2d at 261. Wander ignores this principle, citing *Adams* for the proposition that there is "disputed case law about the need to show prejudice." (Mot. at 24). But he misreads that opinion, as the district court in *Adams* observed that "a defendant seeking a hearing must also show that they have been prejudiced by the disclosure of a matter before the grand jury." *Adams*, 755 F. Supp. 3d at 523 n.4. Far from endorsing Wander's view, *Adams* simply noted that "it is relatively uncommon to find an unlawful disclosure in violation of Rule 6(e), and where no such violation is found, it is unnecessary to reach the question of prejudice." *Id.*

Wander has identified no cognizable prejudice. The relevant touchstone of a prejudice finding is not bad publicity, but whether Rule 6(e) violations "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Walters*, 910 F.3d at 23 (citing *Bank of Nova Scotia*, 487 U.S. at 254-55). Wander comes nowhere close to such a showing.

Wander first complains that "there is every reason to believe" that Damien Alfalla's cooperation was induced by the leaks. (Mot. at 24). But Wander supplies no reason to credit that assertion and the circumstances suggest otherwise. ██████████████████ ███████████████████████████████████████████████ ████████████████████ Thus, there is no causal chain between a purported Rule 6(e) violation and Alfalla's cooperation. More importantly, however, "attributing [a witness's] cooperation to the news leaks is sheer speculation, and not any basis to conclude that the newspaper articles had any impact whatsoever on the grand jury's decision to indict." *Walters*, 910 F.3d at 24. Here, as in *Walters*, there is "simply . . . no reason to think" that news coverage—rather than the public unraveling of Wander's massive fraud scheme—precipitated any witness's cooperation. *Id.*

Wander next recounts the various setbacks to 777's business that resulted from negative press coverage. None of this is cognizable prejudice, nor is it colorable. Wander implies that his business setbacks and negative press derive from the articles about the Government's investigation. He fails to acknowledge, however, that the first article mentioning a government investigation occurred long after numerous reports about Wander's misconduct and mismanagement. Soccer fans showed up to a stadium with protest signs and banners opposing 777 well before any public mention of an investigation into 777. Indeed, the parade of economic maladies that Wander cites throughout the Motion unfolded before any article

28

referenced anything remotely resembling a matter occurring before the grand jury. (*See* Mot. at 9-12).

Wander's related suggestion that Leadenhall sued 777 due to the handful of news articles mentioning an investigation is equally preposterous. (Mot. at 11-12). Leadenhall's May 3, 2024 complaint followed Wander's fraud and failure to satisfy the terms of a settlement agreement they had negotiated, (Mot. at 12), ███████████████████████ ████████████████████████ and made no mention of an ongoing governmental investigation into 777. It is farcical to suggest that Leadenhall's pursuit of civil remedies for Wander's fraud satisfies his prejudice showing under Rule 6(e). The common thread to Wander's civil and criminal misfortune is not a Government leak, but Wander's misconduct.

Because Wander has not identified any cognizable prejudice, his motion must be denied on that ground, too.

29

## CONCLUSION

The Court should summarily deny Wander's motion. Wander accuses the prosecution team of misconduct based on a range of unremarkable news stories that joined a wave of reporting that Wander had been engaged in questionable and fraudulent business practices. Wander is not entitled to a hearing merely because he would like to blame that reporting on the Government. It is his burden to make a preliminary showing that matters occurring before the grand jury were leaked, and that members of the prosecution team leaked them. *See, e.g.*, *Rioux*, 97 F.3d at 662. Wander has not and cannot do either. None of the articles describe any fact, witness, or discussion that actually occurred before the grand jury, nor do any articles reference the "grand jury" at all. Even assuming that some detail in the articles, such as references to subpoenas, could be protected by Rule 6(e), Wander can provide nothing but speculation to associate that reporting to a member of the prosecution team. His speculation is unworthy of belief, especially in light of the prosecution team's categorical denial of his claims. And even if it were clear that the prosecution team had violated Rule 6(e), he cannot show that he was prejudiced. In sum, Wander has not demonstrated his entitlement to a hearing, and the Court should deny his request to obtain one.

Dated: New York, New York
      April 29, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Marguerite B. Colson
Sarah Mortazavi
Alexandra Rothman
Assistant United States Attorneys
(212) 637-2468/2520/2580