UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

*v.*

JOSHUA WANDER,

     *Defendant*.

**No. 25 Cr. 473 (JPO)**

## DEFENDANT JOSHUA WANDER'S REPLY IN SUPPORT OF HIS MOTION FOR AN EVIDENTIARY HEARING

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.     Mr. Wander Has Satisfied the *Rioux* Factors. ...........................................2

         A.     The Government's Declarations Do Not Rebut Mr. Wander's *Prima Facie* Showing Because They Are Incomplete in Material Respects. ...................................................................... 3

         B.     The Government Is Incorrect That the Articles Did Not Disclose Matters Occurring Before the Grand Jury. ................................................. 6

    II.    Mr. Wander Has Established Prejudice from the Leaks. ......................................8

CONCLUSION .............................................................................................................. 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Grand Jury Investigation (Lance)*,
610 F.2d 202 (5th Cir. 1980)..........................................................................................................4

*In re Grand Jury Matter*,
697 F.2d 511 (3d Cir. 1982)............................................................................................................7

*In re Grand Jury Subpoena*,
103 F.3d 234 (2d Cir. 1996)............................................................................................................7

*United States v. Adams*,
755 F. Supp. 3d 519 (S.D.N.Y. 2024)............................................................................................8

*United States v. Rioux*,
97 F.3d 648 (2d Cir. 1996)..........................................................................................................3, 6

*United States v. Walters*,
910 F.3d 11 (2d Cir. 2018)...........................................................................................................5, 9

**PRELIMINARY STATEMENT**

The government's opposition brief and the accompanying declarations raise more questions than they answer.  Rather than providing a complete and transparent account of the circumstances surrounding the press coverage of its investigation, the government offers limited and carefully worded denials that leave the most probative questions untouched and suggest coincidences too exact to be anything but by design.  The government spends much of its papers discussing Mr. Wander's business challenges before the news stories about its investigation, but it cannot rebut his core assertion that he suffered independent prejudice from those stories.  And as Mr. Wander explained in his motion to unseal, while the government repeatedly faults Mr. Wander for relying on reporting that it characterizes as inaccurate, it redacts the very portions of its own submission that might shed light on how the leaks occurred.  Mr. Wander is entitled to a hearing so the Court can get to the bottom of what really happened.

Despite the government's obfuscation, the central facts that emerge from the government's heavily redacted opposition are remarkable: a *Semafor* reporter contacted the U.S. Attorney's Office on November 22, 2023, about a story she was working on regarding 777 Partners.  On November 27, she told the U.S. Attorney's Office that she believed AUSA Nicolas Roos was working on the matter, which, according to the government, was not yet an open investigation.  But by the time of publication, her information was correct.  On November 28, the next day, the U.S. Attorney's Office "administratively opened" an investigation into 777 Partners and assigned the investigation to AUSA Roos.  On November 30, *Semafor* published its story, accompanied by a photo of AUSA Roos, accurately identifying him as the lead prosecutor on an investigation that, one week earlier, did not exist.

What the government does not explain, and what its declarations carefully avoid, is the question that lies at the heart of Mr. Wander's motion: how did a reporter know the name of the

1

specific Assistant United States Attorney in connection with an investigation that, according to the government, had not been opened?  And if the reporting about an investigation really was "wrong," as the government contends, why did the U.S. Attorney's Office immediately open that investigation—and assign it to the same AUSA—after an unfounded inquiry from a reporter?  The government's silence on these questions is itself the answer to them and only strengthens Mr. Wander's *prima facie* showing.

The government next tries to minimize the prejudice the leaks caused to Mr. Wander by attributing it to prior negative stories.  But Mr. Wander has explained how the stories about the government investigation in particular, beginning with the November 2023 *Semafor* Article,[1] prejudiced him in categorically different ways: they precipitated the cooperation of Damien Alfalla and directly caused the collapse of transactions he could have used to satisfy lenders and save the company.  To the extent the government wants to show these harms occurred independently of the leaks, it must do so at an evidentiary hearing.

As Mr. Wander has met his relatively light burden to establish a *prima facie* case, and the government has submitted only incomplete information, the Court should order an evidentiary hearing to examine the prosecution team's conduct and fashion an appropriate remedy.

ARGUMENT

## I.    Mr. Wander Has Satisfied the *Rioux* Factors.

In response to Mr. Wander's motion, the government for the first time disclosed details about its interactions with the press concerning its investigation of Mr. Wander.  But the declarations the government has submitted do not change Mr. Wander's entitlement to a hearing. The new information fails to satisfy the government's burden to "rebut allegations of a violation

---

[1] All defined terms and references to exhibits are adopted from Mr. Wander's opening brief. ECF No. 24.

2

of Rule 6(e)," *United States v. Rioux*, 97 F.3d 648, 662 (2d Cir. 1996), and the government's argument that it was not the source of the leak is unpersuasive. In addition, the government is simply wrong in its claim that no grand jury material was disclosed in the reports.

> **A.      The Government's Declarations Do Not Rebut Mr. Wander's *Prima Facie* Showing Because They Are Incomplete in Material Respects.**

The government's declarations are incomplete, and the narrative they suggest makes little sense. Two of the declarations are so heavily redacted that they include no factual information other than that two Department of Homeland Security Special Agents who worked on the investigation did not leak information about the investigation to the press. Notably missing are declarations from the SDNY public affairs office that interfaced with *Semafor* or any member of the FBI, even though it was the FBI that published the press release about Mr. Wander's indictment and a senior FBI official who was first mentioned in that press release.[2] The government is also incorrect when it argues that the other declaration, from AUSA Nicolas Roos, "mirror[s] those filed in" other cases where courts denied evidentiary hearings. ECF No. 28 ("Opp.") at 25. Each of these information gaps, standing alone, is sufficient to require a hearing.

*First*, the most glaring gap in the government's submission is its failure to explain the connection between the communications from *Semafor* and the purported opening of the government's investigation. The coincidences are too stunning for this Court to credit without specific evidence: at the very least, all communications between the *Semafor* reporter and the SDNY's public affairs office, all case opening paperwork from within SDNY about predication,

---

[2] Founder and CFO of Investment Firm 777 Partners Charged With $500 Million Fraud Scheme (Oct. 16, 2025), *available at* https://www.fbi.gov/contact-us/field-offices/newyork/news/founder-and-cfo-of-investment-firm-777-partners-charged-with-500-million-fraud-scheme.

and indeed, testimony from the relevant players to explain how a reporter could have contacted the government about a non-investigation and created it herself.

Rather than offer an explanation, the government instead points to supposed inaccuracies in the reporting as proof that the leaked information did not come from "anyone participating in the investigation." Opp. at 23.[3] The government's attempted defense, however, ignores that the articles are attributed to multiple sources, who may have contributed different facts to the reporting.[4] *See, e.g.*, ECF Nos. 25-8 (citing "people familiar with the matter"), 25-19 (same), 25-20 (citing "[m]ultiple sources with knowledge of the matter"). That some sources may have been from outside the government—and consequently relayed incomplete or inaccurate information—does not alter the conclusion that information that *was* accurate most likely came from a government source.

The same is true for details about the criminal subpoenas reported in the November 2024 *Josimar* Article. The government claims that those details came from a non-government source. But that claim is difficult to square with the article's additional reporting of a joint federal investigation that names the specific agencies involved. *See* ECF No. 25-20. The far more

---

[3] One alleged "error" the government cites is the reporting that the investigation involved money laundering violations, Opp. at 24. But the investigation did in fact include potential money laundering violations: while it may not have been listed in the February 2024 subpoena to 777 Partners, it was listed in the June 5, 2024, subpoena. *See* ECF No. 24 at 6 (citing the June 5, 2024, subpoena (ECF No. 25-11)).

[4] The government makes much of the fact that the information in these articles are not specifically attributed to a government source, *see* Opp. at 19–20, before finally citing the correct principle of law that "[i]t is not necessary for the article to expressly implicate the Justice Department as the source of the disclosures if the nature of the information disclosed furnishes the connection," Opp. at 20 (quoting *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 218 (5th Cir. 1980)). As explained above, the content of the information and the highly unusual circumstances are sufficient to implicate the government as the source, for purposes of establishing a *prima facie* case.

4

likely source of those details is the federal government itself rather than any outsiders, much less Mr. Wander.

*Second*, the government has not produced a declaration from SDNY's chief of public affairs. The Roos Declaration confirms that the chief of public affairs was contacted by a *Semafor* reporter on November 22, 2023, and again on November 27, the two contacts that immediately preceded both the formal opening of the investigation and the publication of the article naming Roos. Roos Decl. ¶ 6. That official is the only government employee confirmed to have been in direct communication with *Semafor* during the critical window, and the Roos Declaration is silent about whether this individual responded to the outreach from *Semafor* and, if so, what information was conveyed. Yet the government has submitted no declaration from that person and has not produced any emails, notes, or records of those communications.

The government has also not produced declarations from supervisory AUSAs or agents or a declaration from the FBI. Supervisory AUSAs are the individuals who may have had conversations about a "turf battle," and the Roos Declaration only states that "as far as I know" none of the supervisors had those conversations.[5] Roos Decl. ¶ 8(c). The omission of FBI agents and supervisors is equally significant. In *United States v. Walters*, the source of the leaks was an FBI supervisor—not a line agent or the lead AUSA. 910 F.3d 11, 16 (2d Cir. 2018). The government's initial declaration in that case did not cover supervisory FBI personnel. Declaration of Telemachus P. Kasulis, *United States v. Walters*, 16 Cr. 338 (S.D.N.Y. Oct. 21, 2016), Dkt. 44. It was only after Judge Castel ordered a hearing that a genuine internal inquiry—

---

[5] Notably, both of the two supervisory AUSAs listed in the Roos Declaration no longer are employed at the U.S. Attorney's Office, and it is unclear if they were interviewed as part of its inquiry.

collecting phone records, emails, and text messages—revealed the truth: an FBI supervisor had been leaking for over a year.  *Id.* at 19–20.

*Finally*, the Roos Declaration is submitted by a prosecutor who was involved in the underlying investigation, who states that he personally "spoke with the other AUSAs who worked on this matter, the supervisory AUSAs who oversaw the investigation, and the case agents."  Roos Decl. ¶ 4.  That in no way "mirrors" the declaration submitted in the *Adams* case, where a supervisory prosecutor "who was not involved in th[e] investigation" conducted interviews of the investigative team and submitted a declaration with her findings. Memorandum in Opposition at 17, *United States v. Adams*, 24 Cr. 556 (S.D.N.Y. Oct. 18, 2024), Dkt. 38; Declaration of Margery Feinzig, *United States v. Adams*, 24 Cr. 556 (S.D.N.Y. Oct. 18, 2024), Dkt. 38-2.  It is also different from the declaration submitted in *Skelos*, where a member of the investigative team conducted the interviews but also listed for the court the specific dates those interviews took place.  Affidavit, *United States v. Skelos*, 15 Cr. 317 (S.D.N.Y. Oct. 1, 2015), Dkt. No. 33-1 (listing precise dates).  AUSA Roos's personal involvement in the investigation combined with the lack of specific details in his declaration reinforces the need for declarations from other individuals with relevant knowledge, which the government has declined to submit.

### B. The Government Is Incorrect That the Articles Did Not Disclose Matters Occurring Before the Grand Jury.

Mr. Wander's opening brief established that the news stories disclosed "matters occurring before the grand jury."  *Rioux*, 97 F.3d at 662.  The government's arguments to the contrary are unpersuasive.

Even taking as true the government's claim that no grand jury investigation was open at the time the November 2023 *Semafor* Article was published, *see* Opp. at 16, both the March

6

2024 *Semafor* Article and the November 2024 *Josimar* Article clearly postdated the opening of grand jury proceedings, *see* Roos Decl. ¶ 9 (grand jury subpoena issued February 8, 2024), and were published before the time the government claims "the investigation was overt and known to 'dozens of individuals' outside the prosecution team," Opp. at 22.

As to the March 2024 *Semafor* Article, the government concedes that it had conducted one witness interview as reported in the article,[6] Opp. at 10, and had already issued subpoenas, but argues that because the interview "did not occur before the grand jury" it is outside Rule 6(e)'s protections, *id*. at 16.  That argument is legally incomplete.  As Mr. Wander's opening brief demonstrated, witness interviews "conducted outside the grand jury's presence but presented to it" constitute Rule 6(e) material.  *In re Grand Jury Matter*, 697 F.2d 511, 512 (3d Cir. 1982); *see also In re Grand Jury Subpoena*, 103 F.3d 234, 237 (2d Cir. 1996) ("The plain language of the Rule shows that Congress intended for its confidentiality provisions to cover matters beyond those actually occurring before the grand jury," including "all records, orders, and subpoenas *relating to* grand jury proceedings" (emphasis in original)).  The government's carefully worded response—that no witnesses "had testified before the grand jury" at the time of the March 2024 article—does not address whether information from such interviews was later presented to the grand jury through agent testimony, which is standard practice.  Roos Decl. ¶ 10.  Notably, neither the opposition brief nor the Roos Declaration affirmatively states that the witness interview played no role in the grand jury process.

As to the November 2024 *Josimar* Article, the government acknowledges the issuance of criminal subpoenas to employees of 777 Partners and A-CAP but argues that this information is

---

[6] The article apparently misreported the number and identity of the interviewees, *see* Roos Decl. ¶ 10(b), but this detail is irrelevant to the legal question of whether the interview was intended to be presented to the grand jury.

not Rule 6(e) material because the article "does not actually say any of the witnesses were subpoenaed to testify before a grand jury." Opp. at 18. That argument conflates the label with the substance. "Criminal subpoenas" are grand jury subpoenas. The fact that the article did not use the specific words "grand jury" does not mean the information disclosed—that 777 and A-CAP employees were being compelled to appear before the grand jury—falls outside Rule 6(e)'s protection. The government's own citation to *Adams* underscores this: in that case, the Court acknowledged caselaw holding that the identities of subpoenaed individuals may be shielded from disclosure under Rule 6(e) because they are likely to testify before the grand jury. 755 F. Supp. 3d 519, 529–30 & n.8 (S.D.N.Y. 2024). Here, although the article does not disclose the names of the individual recipients, it describes them in sufficient detail as current employees of 777 Partners and A-CAP such that their identities could be ascertained.[7]

## II.    Mr. Wander Has Established Prejudice from the Leaks.

That Mr. Wander suffered severe harm following the publication of the leaks is undisputed. *See* ECF No. 24 at 24. The government instead argues that there is no causal relationship between the events, but its argument is based on faulty logic rather than evidence.

*First*, the government asserts in a single, partially redacted paragraph that "there is no causal chain between a purported Rule 6(e) violation and Alfalla's cooperation." Opp. at 28. But the timing of the leaks and Mr. Alfalla's decision to cooperate alone suggests otherwise, and the government offers nothing to support its blanket denial. The government has not provided Mr.

---

[7] The government's suggestion that the source of this information could have come from outside the government because "SDNY's investigation was overt and well-known" in November 2024, Roos Decl. ¶ 13, is based on nothing but speculation and underscores why an evidentiary hearing is needed. Similarly misguided is the government's effort to redirect attention by recounting a brief social conversation between Mr. Wander and an AUSA at a July 2024 social event. *Id*. ¶ 12. That casual exchange occurred months after the two *Semafor* articles were published and of course did not cause and could not have caused either piece of press coverage.

Wander with discovery noting all the dates of Mr. Alfalla's proffers, despite Mr. Wander's explicit request. Evidence about Mr. Alfalla's internal deliberations and communications with the government would bear directly on the effect the leaks had on the "grand jury's decision to indict." *Walters*, 910 F.3d at 23. Without such evidence, the government has once again obscured Mr. Wander's ability to establish the elements of his claim. Mr. Wander cannot be expected to rebut a one-paragraph, partially redacted denial. That is what a hearing is for.

*Second*, the government's argument that pre-existing negative press about 777 Partners caused its business collapse, rather than the investigation leaks, conveniently misunderstands the nature of the harm.[8] Prior press coverage focused on commercial and operational matters—such as missed payments to vendors, scrutiny of 777 Partners' bid for Everton FC, criticism of its management of various sports clubs, and civil litigation with counterparties. *See* Opp. at 3–7. The *Semafor* and *Josimar* articles did something substantially distinct: they reported that the United States Department of Justice was investigating 777 for federal money laundering violations. *See* ECF No. 24 at 4–8. The government is surely aware of the toxic effect that a publicized DOJ money laundering investigation has on a financial services business actively seeking to raise capital. The record before this Court documents in granular detail how counterparties and lenders specifically cited the DOJ investigation articles—not general financial coverage—when pulling back from 777. *See id.* at 9–12; ECF Nos. 25-26, 25-27, 25-28, 25-29 (counterparty emails citing DOJ articles). The government's own discovery to Mr. Wander contains evidence that lenders and yearslong business partners became acutely concerned about 777 Partners as a viable business partner specifically after the articles disclosing the DOJ inquiry

---

[8] The considerable discussion of this point in the government's opposition, Opp. at 3–7, 28–29, suggests that the government believes that individuals who experience financial difficulties or negative press do not receive the full protections of Rule 6(e) or the presumption of innocence. That is obviously wrong.

appeared.   And Mr. Wander established that these concerns led directly to the serious financial straits his companies found themselves in.

*Third*, the government's prejudice argument is most striking for what it concedes. The government argues that Leadenhall sued 777 Partners not because of the leaks but because of "Wander's fraud and failure to satisfy the terms of a settlement agreement they had negotiated." Opp. at 29.   Yet the government does not pause to ask why 777 Partners failed to satisfy that settlement.   The answer is in the government's own discovery: the principal source of liquidity earmarked to resolve matters with Leadenhall was the TAMI transaction described on pages 10–11 of Mr. Wander's initial brief, which was projected to generate tens of millions of dollars in profits in December 2023 and January 2024.   *See* ECF No. 24 at 4, 10–11.   Without TAMI, there was no liquidity.   Without liquidity, there were no settlement payments.   Without settlement payments, Leadenhall sued.   The way to untangle the knot of prejudice is not to defer to the government; it is for the Court to hold an evidentiary hearing to determine the harm caused by the stories.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Mr. Wander's opening memorandum, the Court should order an evidentiary hearing into the source of the press disclosures about this investigation.

Dated:  May 5, 2026

Respectfully submitted,

*/s/ Jordan Estes*
Jordan Estes
Michael Martinez
Samuel Raymond
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
JEstes@gibsondunn.com
MMartinez2@gibsondunn.com
SRaymond@gibsondunn.com

*Attorneys for Joshua Wander*

11

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York because it is 3,200 words (exclusive of the table of contents and authorities); and

2.      This document complies with the typeface requirements of Local Civil Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York  because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 12-point Times New Roman font, with footnotes that are at least 10-point font.

*/s/ Jordan Estes*
Jordan Estes
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY
10166
(212) 351-2315
JEstes@gibsondunn.com

12